*In re* R.B.W., a Minor (The People of the State of Illinois, Petitioner-Appellant, v. Steve Tamburini *et al.*, Respondents-Appellants (Marie Elena Cobieya, Respondent-Appellee)).

Fourth District   No. 4—89—0193

Opinion filed December 7, 1989.—Rehearing denied January 29, 1990.

Daniel A. Baechle, Special Assistant State's Attorney, of Champaign (Kenneth R. Boyle, Robert J. Biderman, and Gwendolyn W. Klingler, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Don C. Hammer, of Hayes, Schneider, Hammer, Miles & Cox, of Bloomington, for appellants Steve Tamburini and Linda Tamburini.

Steven Nardulli and G. Michael Taylor, both of Stratton, Dobbs, Nardulli & Lestikow, of Springfield, for appellee.

Alan J. Novick, of Jennings, Novick, Eggan & Ostling, of Bloomington, guardian *ad litem*.

JUSTICE SPITZ delivered the opinion of the court:

This is an appeal by the State of Illinois (State), respondent minor R.B.W., and the minor's foster parents, respondents Steve and Linda Tamburini, from an order of the circuit court of McLean County denying the State's petition for termination of parental rights and directing the minor be returned to respondent Maria Elena Cobieya, who was determined by the trial court to be the minor's natural mother.

On September 13, 1985, the State filed a petition for adjudication of wardship of R.B.W., naming Charles and Bette Winks as respondents. Notice to the child's unknown mother and father was published on September 21 in the Pantagraph, a newspaper of general circulation in McLean County, Illinois. Apparently, similar procedures were instituted concerning five other children which had been in the Winkses' custody. On February 6, 1986, the trial court entered a memorandum opinion and order finding the six infants of Mexican extraction, received by Charles and Bette Winks for the avowed purpose of securing their adoption, were illegally in the custody of Mr. and Mrs. Winks and, therefore, the State's motion to strike Charles and Bette Winks as parties-respondents was allowed. The order also struck the Winkses' motion for summary judgment.

In an affidavit in support of the motion for summary judgment, Bette Winks represented that the mother of R.B.W. was Adela Martinez Gomez. On February 14, 1986, a notice to Adela Martinez Gomez was published in the Pantagraph.

On March 4, 1986, the trial court found R.B.W. to be a dependent minor and set the dispositional hearing for April 24, 1986. On March 10, 1986, Charles and Bette Winks appealed. This court on December 11, 1986, after considering the order of the trial court, affirmed in part and dismissed the appeal in part. *In re Winks* (1986), 150 Ill. App. 3d 657, 502 N.E.2d 35.

On March 21, 1986, Steve and Linda Tamburini, the foster parents to whom Department of Children and Family Services (DCFS) entrusted R.B.W., petitioned the court for legal custody. On April 14, 1986, notices in Spanish were published in the Pantagraph directed to the minor's unknown mother, unknown father, and Gomez. On April 24, 1986, the trial court entered a dispositional order declaring R.B.W. a ward of the court and transferring guardianship to DCFS.

On October 21, 1987, after the Winkses' appeal was decided, the State filed a petition to terminate parental rights alleging Gomez and Cobieya to be the minor's mother. Cobieya was served by certified mail and notice was again published to Gomez. Upon receiving the summons, Cobieya asked for and received a continuance to prepare the necessary documents for international travel. Another continuance was requested because Cobieya did not speak or understand English. On March 24, 1988, a motion for leave to file a special limited appearance on behalf of Cobieya challenging the personal jurisdiction of the Illinois court was denied for the reason that Cobieya had appeared generally on February 28, 1988, having moved for a continuance. On the same day, the court ordered a blood test on the minor. The birth certificate of baby (Nino) Cobieya Camargo, born February 1, 1985, in Tijuana, Baja California, Mexico, containing the footprints of the child, was filed with the court. An attempt was made to compare the inked footprints thereon to the footprints of R.B.W., but the prints on the birth certificate were not suitable for identification.

At the hearing on April 25, 1988, the results of blood testing were tendered to the court by counsel for Cobieya. The only participants in the blood testing had been R.B.W. and Cobieya. Objections were made to the admission of the blood test results, and the court reserved a ruling.

Cobieya was called by the State at the first hearing on the petition to terminate parental rights, conducted on May 6, 1988. She testified she knew R.B.W. was her son, and her belief is supported by the documents she possessed and the results of the tests ordered by the court. She named the child Juan Angel after he was born on February 1, 1985, in Baja California, Mexico, at a Red Cross hospital. The father's name was Juan, but she did not remember the father's

last name. She was not married and has never been married. She also had another son born October 18, 1981, whose father is Jesus Fernando Kalisch. She does not know where Kalisch lives. The nationality of R.B.W.'s father is Mexican. She believed she saw R.B.W's father last on May 24, 1984, and she has never received any support from him. He did not know she was pregnant.

Cobieya learned of Bette Winks from a lawyer in Mexico identified as Jose Luis Gonzalez. At that time, R.B.W. was about six or seven weeks old.

On April 24 or 25, 1985, R.B.W. was turned over to Gonzalez. Cobieya received $2,000 in United States currency. She understood the $2,000 to be for the expenses of birth and to help her care for her other son. She also believed the child would be delivered to Bette Winks, a person the lawyer told her was an honorable person and who was well off and had good morals. She did not meet with Bette Winks prior to delivering the child to the lawyer. She thought Winks would adopt her child and keep in constant communication so Cobieya would know her son was well cared for. She did not negotiate for the $2,000. She estimated her expenses for the birth of this child at $500 and used the $2,000 to pay those expenses and then for her other child. She was told Bette Winks lived in the State of New York.

On May 13, 1986, Cobieya met Winks in San Ysidro, California, at a Jack in the Box restaurant. Winks told Cobieya to steal her child back. Winks gave Cobieya some travel instructions advising her to go to Champaign and call Winks when she arrived. The instructions were in the form of a note, which were only partially interpreted by Cobieya at the time and which meant very little to Cobieya because she had no knowledge concerning the United States outside of California. It was at this time she realized Winks was not as nice a person as she had been led to believe since Cobieya was advised six other children were removed from Winks along with R.B.W. Also on the paper was the name and address of Steve Tamburini. After May 13, 1986, Cobieya did telephone Winks to advise Winks Cobieya wanted to proceed in a legal fashion to avoid further problems.

On or about January 21, 1987, Cobieya received a letter from Charles Reynard, the attorney representing Bette Winks. Again Cobieya enlisted the aid of a friend to translate the letter, but the friend read only selected parts and did not understand fully. Had the whole letter been read to Cobieya, she would have realized her son was in Illinois. She did not know how to contact Reynard, and she understood Winks was in jail. Thereafter, she went to the Mexican authorities. After May 13, 1986, she did not attempt to contact R.B.W. be-

cause she did not know where he was and she did not attempt to contact Tamburini because she did not know who he was. In February 1987, Cobieya met with officials of the United States Immigration and Naturalization Service (INS). She advised INS she was R.B.W.'s natural mother, and a special agent relayed this information to DCFS in February 1987.

Cobieya testified she does have a job when she returns to Mexico. She worked in a clothing store, although she did not know the names of her supervisor or the owner of the business. Neither did she know the street address of the store. Her pay was 70,000 pesos per week. Cobieya went to grade school, one year of high school and one year of secretarial school. All her family and friends live in Mexico, and she has lived with her family all her life. She said she had good relations with her parents. However, the birth of this second child out of wedlock caused problems, and they threatened to kick her out. During her testimony, Cobieya identified two photographs, one of Juan Angel, which she dated April 21, 1985, and which she always carries with her. The second was a picture of R.B.W., which she first saw in June or July 1985, and which Bette Winks had given her. She has subsequently repaired relations with her parents, and they support her attempt to get her son back. She came all this way to be in court because she wants her son back. Her father is a guard for the government. They live in a middle-class home, and she describes the home as a big home, with two bedrooms, a living room, dining room, and kitchen.

During the time R.B.W. lived with her, shortly after his birth, she was a full-time mother including bathing, diapering, and changing his clothes. After she delivered the child to Gonzalez, she returned to see the lawyer at least monthly for news about the child. If she knew then what she knew now, she would not have taken her son to the lawyer. Prior to the time she delivered the child to Gonzalez, she had not noticed any special marks on the child's lower back. However, her older son also did not have any marks when he was young, but some marks are appearing as he grows older.

At hearing on May 11, 1988, the State raised the issue of whether Cobieya had the burden of going forward to prove she was the mother or whether the State had the burden of going forward to prove she is not. Also at the hearing, Ann Heath, a physician with a family practice from Clinton, Illinois, testified she first observed R.B.W. on September 20, 1985, when she gave him a complete physical examination. Heath is the Tamburinis' family physician.

Heath testified there were birthmarks on the child, a mongolian

spot on the child's lower back and a macular hemangioma on the back of his neck at the hairline. Heath testified these spots were clearly visible and would have been visible to anyone who changed the child's diaper or bathed R.B.W. It was her opinion both existed from birth and that these types of marks do not spontaneously occur after birth. The mongolian spot was approximately two by three inches in size, ovoid in shape, a dark shade of brown and clearly defined from the surrounding skin. The macular hemangioma is reddish and also clearly visible. In her experience, she had never witnessed a macular hemangioma appearing spontaneously following birth. She testified she had been taught during medical school and her residency that these types of spots occur at birth. She relied on Nelson's Textbook of Pediatrics, which indicates those spots are present at birth. However, she admits Nelson's does not specifically discuss the topic of spontaneous occurrence of these spots after birth. She did not consult any other studies, and she knows of no studies which have even been conducted as to whether or not the spots spontaneously occur after birth. She testified the mongolian spot appears more frequently in children with darker pigmentation of their skin, and since beginning her practice in Clinton she has delivered three babies with mongolian spots.

The trial court found that—although there was a question of credibility of Bette Winks, Cobieya's testimony about Winks' comments were hearsay, and the original footprints on the birth certificate lacked sufficiently clear ridges and valleys so as to allow for a comparison—based on the trial court's understanding of the blood test, showing 97.8% of women could be excluded as the mother of R.B.W., there was a strong probability of maternity. The trial judge also relied on the identity of dates of birth, as testified to by Winks and Cobieya, and identity of the dates Cobieya turned the child over to the lawyer with the date Winks acquired the child, in addition to the fact Cobieya traveled all the way from Mexico to assert her rights that she was the mother of R.B.W. The court concluded that the only thing Cobieya had not been totally candid about was the identity of the father, but the judge did not know whether she was afraid to disclose the father's identity or whether this was a custom in Mexico. As a result, the trial court ruled Cobieya was the natural mother of R.B.W. and directed she be provided visitation. Thereafter, Gomez was ordered stricken from the proceedings.

At a hearing on September 26, 1988, Judith Ingram, an adoption specialist with DCFS, testified no parent has provided any support payments for R.B.W. She then went on to describe the five court-approved visits between Cobieya and R.B.W. On the first visit, the child

was aware of Cobieya's presence and performed for her and the foster parents on the playground equipment at the park where the visits were conducted. Cobieya attempted to talk to R.B.W. in Spanish even though the child only understands English. There was more contact between the two during the second half of the visit, although somewhat physically distant. It was a casual, friendly, relaxed visit, lasting an hour to an hour and a half. At the next visit, R.B.W. was aware Cobieya was there, but his interaction was more directed toward his foster parents. On one of the visits, when R.B.W. fell while playing on the merry-go-round and both Cobieya and the foster mother reached for him, R.B.W. pushed Cobieya away and went to his foster mother. During one of the visits, Cobieya took pictures and pictures were taken of Cobieya holding R.B.W., and R.B.W. did hold her hand. At the close of each of the visits Cobieya did kiss the child on the cheek and R.B.W. tolerated it, and was friendly toward her. After Cobieya returned to Mexico, she had some photographs sent back for the foster parents to have. No gifts, cards, or support was sent by Cobieya after she returned on June 7, 1988.

Ingram also described the child's interaction with the foster parents. When they hug him, he responds in a lingering hug. He initiates sitting on their laps and walks closely with them while they are walking together. Since the visits with Cobieya began, he has initiated more interaction with the foster parents because of insecurity, needing more verbal reassurance during play.

Ingram talked about bonding. She gave her opinion after having observed the foster parents and the child that R.B.W. had bonded to the foster parents. R.B.W. gives them preference over anyone else in a group, and he calls them mommy and daddy. These are the people to whom R.B.W. shows his insecurities. These are the people he chooses to help him when he falters or when he is hurt. These are the primary people he performs for in the park and from whom he needs recognition. He has an obvious preference for them. He is very comfortable and happy in their presence. She said she saw none of these things in R.B.W.'s relationship with Cobieya. He was performing for her only as part of an audience.

Pursuant to the court's instruction, R.B.W. was not told Cobieya was his real mother. Nor is it likely this three-year-old would have recognized her to be his mother. On cross-examination, Ingram admitted there was substantial literature that a child may bond on numerous occasions throughout his life in a secondary kind of way, but she commented that there is some current literature which suggests primary bonding can occur only once. Nevertheless, she has seen foster

parent-child relationships turn into parent-child relationships through adoption even where children over ages two or three are placed in foster homes. She has seen a bonding relationship occur within a nuclear family unit after the child is two or three years old where contact is maintained for a period of several months on an ongoing basis.

Ingram understood Cobieya is a young, single individual and is not a person of means. She had traveled here from Mexico and had to sustain herself. No one from DCFS contacted her and offered her the services of the State of Illinois, and even after the trial court determined she was the natural mother, no one contacted Cobieya to see if any kind of rehabilitation program could be established between her and R.B.W. DCFS does not ordinarily make rehabilitation service plans when a termination of parental rights petition is on file. A case review is done every six months on a child, and the goal of the current plan is adoption pending the legal decision of the court. Even though R.B.W.'s primary language is English and Cobieya's is Spanish, they had a good deal of interpersonal communication based more on body language, such as smiles. Ingram has no reason to believe that Cobieya came from Mexico and stayed from February 1988 to July 1988 for the purpose of getting her son back to resell him.

Mary Campbell, an associate professor of social work at Illinois State University, testified she met R.B.W. and the Tamburinis on March 19, 1988, to determine the Tamburinis' sensitivity to R.B.W.'s culture. Campbell believed the Tamburinis were trying to instill a sense of pride in R.B.W.'s Hispanic culture. They had a bilingual game with flash cards which they played with him and participated in Hispanic cultural events. In addition, Steve Tamburini was taking a course on the culture of Mexico. Campbell testified the games the Tamburinis' had purchased for R.B.W. were not easily available and were only obtainable at speciality educational stores. Campbell was asked to opine whether the Tamburinis were taking appropriate steps to care for R.B.W. with regard to cross-cultural adoption. She stated this was divided into two aspects: self-esteem and racial identity. Self-esteem deals with whether the child likes himself and feels loved, while racial identity focuses on whether the child accepts himself for what he is. She stated she could not speak to the issue of self-esteem, but can speak to her understanding of what has been done to encourage and integrate into the child's development a sense he is Spanish and that being Spanish is something good. She indicated with regard to self-esteem that that was very much tied to the issue of bonding, but she did not have enough experience to express an opinion in that area. However, she never stated her opinion as to racial identity and

whether the Tamburinis were taking appropriate steps to instill them in R.B.W.

Campbell indicated that the Tamburinis contacted the Bloomington-Normal Mexican Community through the Western Avenue Community Center. She did not believe one needed an entire Hispanic community to feel Spanish. It does take a good solid family with love and nurturing, as well as the availability of good role models. The Tamburinis are not bilingual. Several studies have shown that if an adoptive family feels good about a child's ethnic background, the child will grow up feeling good about that and about himself. She indicated the Tamburinis have expressed some intention of moving from Clinton to Bloomington. In the Bloomington-Normal area there is an Hispanic community, a church which has a Spanish mass, and a wide range of opportunities including two universities, with Spanish being one of the primary courses in the foreign language department at Illinois State University. She recommended that if the child is returned to his natural mother, assistance be provided to help the child through the process since the child has been with the Tamburinis for about three years.

The next witness to testify was Christina Louise Sipula, coordinator and founder of Clare House of Hospitality in Bloomington, Illinois. Clare House was Cobieya's temporary place of residence while she was in Illinois. The pictures which were taken of R.B.W., Cobieya, and the foster parents were developed locally. They were not received from Cobieya after she returned to Mexico. Cobieya has telephoned twice and has written. At this point, there was an objection made concerning the cross-examination of this witness to matters outside of direct examination. The objection was sustained. There was an indication Sipula would later be called as a witness for Cobieya.

Linda Tamburini testified she and her husband work at Dr. John Warner Hospital in Clinton. R.B.W. has lived with them for three years. They have had three other foster children, but no others right now. They have no natural children and are not able to have any. R.B.W.'s motor skills were limited when he arrived at their home at age seven months, but he progressed after about a month of living with them. He was unable to sit up, crawl, or hold a bottle when he arrived. When he arrived, the back of his head was bald and his head very flat and he had severe diaper rash with bleeding. Within about a month, the diaper rash was gone. His hair grew back. R.B.W. is now attending preschool.

The Tamburini home in Clinton is an eight-room house. R.B.W. has his own bedroom with Hispanic decor. She said he is fully inte-

grated into both their immediate and extended family and that he has lots of relatives who care about him. He goes with them everywhere and many people assume he is their biological child. The child calls her and her husband "Mom" and "Dad." The Tamburinis regularly take R.B.W. to a doctor and dentist.

Tamburini described the visits involving R.B.W. and Cobieya. In the initial visit R.B.W. was shy for about 20 minutes. She said this is typical when he meets a stranger. At the second visit, he was initially shy and aloof, but then warmed up. R.B.W. was introduced to Cobieya by Tamburini saying, "This is Maria, and she is a friend of Judy's, and Maria is from Mexico." Neither she nor her husband has ever told R.B.W. that Cobieya is his mother, nor have they informed him of the court proceedings. During the third visit, the child became anxious and kept running to them repeating "I love you mom, I love you dad." Whenever Maria would attempt to help R.B.W., he would say "No, my mommy will help me," or, "No, don't touch me." There were, however, times he would allow Cobieya to help him. Subsequent to the visit, he awoke crying five or six times. The fourth and fifth visits went pretty much like the third, though he seemed even more anxious. That recurred for a couple of days following subsequent visits. There would be difficulty separating him from his foster parents when going to the baby-sitter. He reverted to baby talk and would follow them around after visits, wanting to know where they were going. Cobieya, although she had an interpreter, never asked the Tamburinis about the last three years in the child's life. Tamburini indicated they occasionally gave R.B.W. Mexican food to eat and that when he was beginning to talk they put simple words in English and Spanish. Tamburini indicated her husband took a college course on modern Mexico and that R.B.W. knows he was born in Mexico. They attended a DCFS-sponsored Mexican dinner. Christina Deutsch attended a DCFS meeting once and provided information about the culture and food. They also played lingo bingo, a game with Spanish and English flashcards. Tamburini stated R.B.W. has several Spanish books, including one with Mexican nursery rhymes. He has another book about two ghosts, one of which is a Mexican ghost which celebrates November 2nd, the Day of the Dead, while the American ghost celebrates Halloween. She also indicated they had Spanish language tapes with Mexican songs and had also read to him on a book about prejudice written from a child's point of view.

On cross-examination, Tamburini admitted that although she and her husband were interested in adopting R.B.W., they never asked Cobieya about the first few months of the child's life either. She

stated there was nothing Cobieya did which would cause anxiety in the child, and he has been around many other people, relatives, and a baby-sitter, whose presence did not engender anxiety or sleeplessness. There are 40 to 60 people living in Clinton who are of Mexican or El Salvadoran background, but the Tamburinis have not made contact with them. In addition, at the end of the DCFS meeting Deutsch attended, Deutsch offered to make herself available to everyone there if they had any questions, but the Tamburinis did not call her. She also recognized there is a great deal of prejudice in this county and it would be difficult for R.B.W.

Sipula returned to the stand to testify she actively resides at Clare House and has a pretty good grasp of Spanish, having studied it four years. In addition, Cobieya studied English every day at Clare House. Cobieya was very happy, helpful, hard working, and very secure. Sipula observed Cobieya around children. Even though the children did not speak Spanish, she would get them interested by singing songs to them and before long they would be sitting near her or on her lap. None of the children were frightened of her, and they would search her out if they came back. Sipula thinks Cobieya would be a wonderful mother based on what she saw and the way she talked about and displayed photographs of her other child. Since returning to Mexico, Cobieya has written one letter and called twice. The telephone calls came on days of court sessions, and she inquired about what happened. The letter was about her life and going back and being with her son and wanting to return to be with R.B.W. After she visited with R.B.W, Cobieya was very happy. In the early proceedings when there was a possibility she would not be able to see R.B.W., she was very saddened by that. She hoped to be reunited with her child.

Christina Deutsch testified she is the Hispanic outreach director of the Western Avenue Community Center (WACC). She is originally from Bolivia and has lived in the United States for 23 years, 10 years in the Bloomington-Normal area. There are an estimated 1,200 people in the local Hispanic community within McLean County. The WACC acts as a liaison with other community agencies, helping with the physical needs of persons coming to the area as well as helping them to become integrated into the community, familiarizing them with the judicial system, schools, insurance, driver's licenses, and doctors. She believes there exists a racial and cultural bias against Mexicans in the cities of Bloomington and Normal, and in McLean County. No one contacted Deutsch to request assistance in establishing a cultural heritage in the mind of R.B.W. She became familiar with Cobieya when she was asked to translate. They were in contact as often as three

times per week, and on Fridays Cobieya spent most of the afternoon and evening at the center for "Hispanic Night." She also invited Cobieya to her home. Deutsch opined that Cobieya was not bitter and was a delightful person. She has seen Cobieya interact with children and take care of an eight-month-old baby. Deutsch believes Cobieya is a very dedicated mother, putting her children's needs before her own. Cobieya indicated her stay in the United States was a hardship and that she was going back to take as many jobs as she could to recover from her financial difficulties. It was also painful for her to be separated from her son in Mexico. During the visits with R.B.W. in the playground, Cobieya and R.B.W. got along well and he did not seem afraid of her. Yet she did not want to seem too pushy. After the encounter, she was glad she had the opportunity to see him and was very happy he was well cared for.

She agrees it would be difficult to detect R.B.W.'s Hispanic origin by looking at him. He has no accent. She feels there is nothing degrading about being a Mexican, but believes a person might feel discriminated against simply because he has to tell people he is from a Mexican heritage. After the potluck dinner held for the foster parents of the Mexican children attended by the Tamburinis, none of the foster parents contacted her. She believes there is a difference from being raised in your culture and knowing who you are rather than merely being told who you are. If you are raised in a culture in which your own culture is looked down on, a person would not feel proud of his own culture. She did not know if R.B.W. would be subjected to prejudice in Mexico because he only speaks English. She does not believe it is culturally acceptable or proper to sell children in Mexico. She has attended seminars in which educators have indicated an attempt to pass as an "Anglo," while at the same time being proud of one's ethnic heritage, can create a tension and turmoil within the individual.

The court also received into evidence a report prepared by the Procuraduria para la Defensa del Menor y la Familia (DIF). Previously Special Agent Jack Parks, of the United States Immigration and Naturalization Service, had testified about his participation in the Winks investigation and how he learned Cobieya claimed to be the mother of R.B.W.

On October 19, 1988, after considering memoranda of law from the parties, an *amicus* brief from the government of the United Mexican States, correspondence from the consulate general, a letter from the legal advisor for the United States Department of State, and an opinion letter from Dean Peter Hay of the University of Illinois College of Law concerning the treaties between the two countries, the

court entered an order finding R.B.W. is the son of Cobieya; he was born on February 1, 1985, in Tijuana, Mexico; and when R.B.W. was approximately two months old, Cobieya turned over custody of R.B.W. to an attorney in Tijuana, Mexico, upon the following terms: (1) she would be paid a sum of money sufficient to pay for the costs of confinement and delivery of her older son and the costs of confinement and delivery of R.B.W., as well as certain other debts; (2) Cobieya would have the right to visit R.B.W. at any time and she would receive periodic reports concerning the health and condition of the child as well as periodic photographs of him; (3) R.B.W. would be placed in the home of Bette Winks, who was represented by the attorney to be an American woman who had no children of her own, who was incapable of bearing children, and who had sufficient funds to support R.B.W. in a very comfortable life-style; and (4) the attorney would deliver custody of R.B.W. to Bette Winks in Tijuana promptly. The court further found Bette Winks took custody of R.B.W. in Tijuana, Mexico, and illegally left Mexico with the child, illegally entered the United States with R.B.W., and took him to her home located in Hudson, Illinois, and that Cobieya received the cash payment agreed upon. R.B.W. was taken into custody upon the order of the circuit court in the home of Bette Winks and was placed, by order of the circuit court, under the temporary guardianship of DCFS and the child was placed in the foster home of Steve Tamburini and Linda Tamburini, and that he has resided continuously in the Tamburini foster home since his initial placement. Last, the trial court found the allegations of the petition to terminate residual parental rights of Cobieya have not been sustained by the evidence. It was therefore ordered that the petition to terminate residual parental rights of Cobieya be denied and that DCFS develop a plan to instruct R.B.W. in the Spanish language, to reintroduce R.B.W. to Cobieya, to fix a time table for the return of R.B.W. to the custody of Cobieya subject to the guardianship, and that DCFS communicate with child-welfare authorities in the Republic of Mexico concerning casework with the minor respondent and Cobieya upon their return to the Republic of Mexico.

Further dispositional hearings were held subsequently. Bette Trout, B.S., R.N.C., Infant Mental Health Specialist for The Infant-Parent Institute, Inc., was called by the People to testify at the hearing conducted on December 13, 1988. She identified herself as a therapist. In April of 1988, Trout met with R.B.W. and the Tamburinis as a result of a referral from Ingram to assess R.B.W.'s relationship with the foster parents and the possible impact on R.B.W. of separation from the foster parents. She met with them approximately seven

times, three times in preparation for the first assessment report. One of these visits was in her office, and Michael Trout, a psychologist, was also present. The two other meetings were conducted in the Tamburinis' home. Each session lasted about two hours. Her report, dated May 3, 1988, noted the following observations, assessments, and recommendations:

"OBSERVATIONS

[R.B.W.] is a very active, energetic, strong-willed three-year-old. He plays independently for moderate periods of time, incorporates others in his play, and is imaginative in play activities. When at home, he generally appeared relaxed. He freely played, sought new toys or activities, and entered in conversation with his foster parents. Both Mr. and Mrs. [Tamburini] displayed interest in his activities, anticipated some of his needs, and calmly permitted [R.B.W.'s] statements of independence. [R.B.W.'s] play was, at times, aggressive (i.e., balloon throwing, car racing). Mrs. [Tamburini] was watchful as situations intensified, and implemented firm limits, to which [R.B.W.] responded each time. On occasion, both Mr. and Mrs. [Tamburini] used an effective diversion in order to involve [R.B.W.] in a more acceptable activity. [R.B.W.'s] high level of activity looks much like a response to anxiety. Additionally, his demanding attitude and the intensity with which he responds when he is not 'in charge' of a situation, raises questions about his level of anxiety. Since [R.B.W.'s] foster parents describe this behavior as beginning about four months ago, it must be considered whether this behavior is a developmental stage, or a reaction to an upsetting event.

Following discussion about [R.B.W.'s] former foster brother, [R.B.W.] became much more demanding; the volume of his voice intensified as he demanded the undivided attention of his foster mother.

During the course of this assessment, both Mr. and Mrs. [Tamburini] were cautious about what [R.B.W.] may overhear in our conversations. Although they report that no discussion of court or custody-related matters takes place in front of [R.B.W.], it is highly likely that he would sense their anxiety or distress, in spite of their careful efforts to conceal.

The [Tamburinis] have been sensitive to the development of [R.B.W.'s] cultural heritage. They have taught him Spanish words, and his bedroom is decorated to reflect his Mexican heritage.

## ASSESSMENT AND RECOMMENDATIONS

Although reliable information about [R.B.W.'s] life until age six or eight months is unavailable, it is clear that he experienced a series of traumatic events. At the very least, it is apparent that he had numerous caregivers, changes, and losses. If he spent extended time with one person on whom he came to depend, then he endured the loss of an attached relationship. Either way, [R.B.W.'s] experiences in his early months will affect his responses to subsequent relationships. [R.B.W.'s] loss of (and his inability to understand his separation from) his foster brother are not innocuous. I believe this event has provoked anxiety in [R.B.W.] and has left him uncertain of his security with the two people he considers to be his parents. [R.B.W.'s] 'obstinate,' demanding behavior reflects his worry about life events for which he has no control. At [R.B.W.'s] age 2½ years, a child disappearing from the household (as his foster brother did) would elicit worry about whether the same might happen to himself. These worries would be elicited, at that particular developmental stage, no matter how thorough an explanation was given or how gradual the move was. [R.B.W.'s] earlier history of losses increases his vulnerability to such experiences.

Mr. and Mrs. [Tamburini] have been supportive of [R.B.W.'s] developmental needs. They calmly permit [R.B.W.] to exercise his desire for control, while firmly setting the limits he needs.

[R.B.W.] clearly has an attached relationship with the [Tamburinis], and they with him. For [R.B.W.] to lose his parental figures at this time would be extremely detrimental. Because [R.B.W.] has already endured a significant number of losses in his short life, the effect of subsequent losses becomes increasingly potent. If [R.B.W.] were to become separated from the [Tamburinis] at this time, the visible effects which might be noted are: he would become more aggressive or hostile, social withdrawal [sic], have increased physical injuries and illnesses (particulary upper respiratory ailments) and may develop nervous behaviors (i.e., nail biting). Other, less visible, effects might include the development of shallow relationships, failure to develop trusting relationships, chronic emotional stress and unhappiness. (These symptoms may later become more visible as repeated divorces, job changes and moves.)

[R.B.W.'s] history of loss has made him emotionally vulnerable, and in need of special care. The [Tamburinis] have been

able to provide that special care to him for the past 2½ years. [R.B.W.] is fortunate to have been placed with them, and to have the option of being adopted as a permanent member of that family. The damage of [R.B.W.'s] early life experiences has been minimized by the stability he has experienced subsequently. Each assault to [R.B.W.'s] sense of stability will be much more detrimental, and will make recovery less likely for him.

Considering the ways the threat of separation provokes anxiety in all members of this family, and the damage a separation would cause [R.B.W.], it would be in [R.B.W.'s] best interest to be adopted as soon as possible by Mr. and Mrs. [Tamburini].

Additionally, it would be in [R.B.W.'s] best interest to have no further short-term foster children in the household until he is at least four years old. At that age, [R.B.W.] would be better able to understand a separation, and would experience such a separation as less of a personal threat."

In July 1988, Ingram again referred R.B.W. to Trout for assessment because R.B.W. was experiencing some behavioral changes subsequent to visits with his biological mother, including sleep disturbances, nightmares, clinging behavior, fearfulness, and aggression. Trout met with R.B.W. and the Tamburinis on July 8, 13, and 15, 1988. Her second family assessment report, dated August 2, 1988, makes the following observations, assessments, and recommendations:

"OBSERVATIONS

As observed in the earlier assessment, [R.B.W.'s] play was noted to reveal a great deal of intensity and anxiety. His need for control of situations was observed to be greater than previously noted. A theme consistent in [R.B.W.'s] play was his persistent effort to make things stay where they are. For example, he repeatedly parked his toy cars, saying 'You stay right there' and 'Don't move.' Sometimes these commands were accompanied by threats: 'Stay there or I'll throw you in the water.' [R.B.W.] called his bigger trucks 'monsters.' When [R.B.W.] provoked the smaller toy vehicles to attack the 'monsters,' the smaller ones won the battle. On several occasions, [R.B.W.] demanded answers to questions regarding his own play. For example, instead of playing imaginatively by creating his own story, [R.B.W.] would push his car along and demand that I tell him where the driver was going, and why he was going that way. In response to most questions directed to him, [R.B.W.] responded saying, 'You tell me.'

During this assessment, [R.B.W.] was willing to draw or write *only* if I held the pencil with him; during the assessment in April, [R.B.W.] proudly presented me with a picture he had painted while I spoke with his foster parents.

When [R.B.W.] came to my office, he demanded to have the door locked after he heard voices coming from the hallway.

DISCUSSION AND RECOMMENDATIONS

There are many indications that [R.B.W.] is not feeling very safe, and that his need for control is increasing. Already established are [R.B.W.'s] increased needs for stability, predictability, and control over his environment. [R.B.W's] earlier experiences of loss and separation increases the significance of anything that may threaten his sense of stability or control.

At this time, to a greater extent than was observed in April 1988, [R.B.W.'s] behavior indicates that his sense of security is threatened. Although Mr. and Mrs. [Tamburini] offer [R.B.W.] a great deal of security and support, they are unable to give him the absolute assurance which he so desperately needs. The [Tamburinis] have, long ago, become [R.B.W.'s] psychological parents, yet they are unable to give him what he needs the most: assurance that he will remain with them. [R.B.W.s'] adoption by the [Tamburinis] would serve to assist him to establish security in his relationship with them, and in his relationships yet to come.

Since [R.B.W.] does not have a relationship with Ms. Cobieya, and since his visits with her are unsettling and confusing, it is recommended that such visits be discontinued. [R.B.W.] lacks an ability, at this time, to understand the dynamics of such a relationship. In two years, an evaluation of whether there may be benefits for [R.B.W.] to establish a relationship with Ms. Cobieya may be appropriate."

Trout testified her recommendation includes immediate adoption to eliminate the threat of R.B.W. being removed from the Tamburini home. R.B.W. would not, in this witness' opinion, be able to have a significant recollection of familiarity with his natural mother from the first 2½ months of his life. The continued visitation is very stressful to R.B.W., and she recommends that whatever the court decision, the decision should be made quickly. If he is returned to his biological mother, she feels visitation for Tamburinis during the transition will be beneficial. During cross-examination, this witness testified that young children are traumatized when left with a baby-sitter or day-care center, or there is a change in baby-sitter. This witness has never

met with Cobieya. Nevertheless, she believes Cobieya's mothering acts toward the child confuse the child.

Ingram returned to testify on February 21, 1989. She testified she saw Cobieya weekly during the visit with R.B.W. Cobieya is now married and pregnant. Cobieya has learned some English now so Ingram can talk with her. Cobieya is attending Adult Education Classes at Bloomington High School twice weekly. When Ingram observes R.B.W. speak Spanish to Cobieya, it is not in a polite, cordial way but a mocking way, making no effort to repeat the Spanish. He used to repeat the Spanish with pride. Cobieya does initiate physical interaction, and R.B.W. allows her to kiss and hug him a little at the visit's end. Otherwise, he avoids her. R.B.W. is verbally and physically aggressive toward Cobieya's seven-year-old son. He behaves in ways she has not seen him behave otherwise and uses language she has not heard him use on other occasions. R.B.W. does not talk extensively with the Tamburinis about the visits, but he still has nightmares. If the child were returned to his natural mother, it would take about three months of daily exposure to Spanish to enable him to state fundamental needs without feeling stressed. Ingram does not believe R.B.W. should be returned to Cobieya, but if this happens, the return should be planned so as to provide as much emotional assistance as possible to everyone involved. To this point, no plans had been implemented to assist the Tamburinis in separating from R.B.W. because DCFS did not know whether that would occur. During the visit R.B.W. is aware his behavior is inappropriate and will apologize if it is called to his attention. Cobieya's behavior toward her other son is very appropriate, and her other son is well behaved. As evidenced by the older son, Cobieya has good parenting skills. There is a different relationship between Cobieya and R.B.W. than her relationship with her other son. On the advice of Trout, R.B.W. had not yet been told Cobieya is his mother and the court has admonished Cobieya not to communicate that to R.B.W. Cobieya is delighted to see R.B.W. and does nothing actively to encourage his inappropriate aggressiveness.

Lastly, Sue Moriearty, a clinical psychologist, testified as an expert in the area of psychology for the purpose of evaluating the testimony and reports previously presented to the court. Her report, prepared on referral from Cobieya's attorney, was prepared after reviewing the testimony of Bette Trout, as well as the family assessments completed by Bette Trout and the developmental assessment completed by Michael Trout. She also reviewed literature regarding attachment and had an informal interview with Carol Ann Ryan, Ph.D., Professor of Modern Languages at Illinois College, Jackson-

ville, Illinois. The Moriearty report discusses the issues of attachment and language and concludes with a recommendation:

"ATTACHMENT ISSUES:

The major focus of the documents reviewed had to do with 'Attachment'. Attachment between infants or children and their caregivers is the focus of considerable research at this time. While reviewing the topic, this examiner found over 100 citations under Attachment in the 1988 *Psychological Abstracts* which cover journal articles in the field of Psychology. These articles look at a broad range of attachment behaviors from the child who is severely under-attached and is sometimes autistic to the overly dependent child. A considerable body of research also focuses on the normal child with multiple caregivers.

Like most things, extremes in any direction appear to cause difficulties. Children or infants in institutional settings or multiple homes with too many caregivers have difficulties bonding. Likewise, children with exposure to only one or a very few caregivers become dependent and often have trouble adapting to school or other environments when their primary caregiver is absent. Moderation appears to be the key. In Volume 3 of *Child Development and Research,* an article by Mary D.S. Ainsworth, one of the pioneers in Attachment Research, says:

'It is usual for an infant to form more than one attachment even in the first year of life....the evidence does not necessarily suggest that it is essential or even optimal for mother and child to form an exclusive dyad. Indeed, a spreading of attachment relationship over several figures may be healthy and may, under some circumstances, prove to be highly adaptive. In one sense, "multiple" mothering is an insurance against separation disturbance.'

Recently, the *Journal of Consulting and Clinical Psychology* (*Vol. 55,* No. 6, Dec. 1987) did a special series on the issue of Infant Attachment and Psychopathology. Several of the articles utilized the Meta-Analytic Method where similar previously published articles were analyzed as a group. Of importance from this Meta-Analysis is the emergence of infant temperamental variables as a predictor of attachment behavior. If this result is interpolated to [R.B.W.], one might predict that [R.B.W.'s] good adaptation and attachment to his foster parents should predispose him to good future attachments to other select caregivers. This analysis of the data is in direct opposition to Bette Trout's contention that [R.B.W.'s] very early experi-

ences will make bonding difficult; in fact, [R.B.W.] has proved that he is quite capable of bonding. Soon after two early separations he was able to bond with his foster parents.

Bette Trout reports significant behavior changes in [R.B.W.'s] behavior beginning in May. She attributes these changes to [R.B.W.'s] uncertainty about his current placement which she feels is caused by his visits with his natural mother. If this is true this examiner feels that all adults involved need to meet with an expert to develop a better visitation plan. If the situation where the visits occur is artificial and constrained, a more comfortable location should be found. If the foster parents are telegraphing their anxiety and perhaps even reinforcing [R.B.W.'s], a plan of [sic] modify the foster parents' behavior should also be developed.

This examiner would predict few, if any, negative consequences to [R.B.W.] developing a warm relationship with this [sic] natural mother. He is, by all accounts, a bright, active little boy who has bonded well with his foster parents, grandparents, and babysitter. He should be able to accommodate one more caregiver in his life. The fact that this caregiver may not be a permanent caregiver should not preclude this relationship. He would be expected to adapt well to the loss of just one of his several significant relationships. The fact that this caregiver may become the primary caregiver should mandate he be provided with the opportunity to develop a relationship as soon as possible. If he does ultimately live with his natural mother, a strong bond with her will be very beneficial.

LANGUAGE ISSUE:

While the Attachment Issues were discussed at length in the reviewed documents, there was no mention of language acquisition. This examiner conferred with Dr. Carol Ann Ryan, Professor of Modern Languages at Illinois College, Jacksonville, Illinois, regarding this issue. In summary, acquisition of grammar and vocabulary do not appear to be problematic; they can occur at any time. However, that ability to speak without an accent is related to age of acquisition. The phrase 'the earlier the better' appears to be accurate.

In this case the potential exists that [R.B.W.] may eventually live in a Spanish-speaking culture, therefore an intensive exposure program is warranted. The risk of his eventually speaking with an accent increases each day without sufficient exposure to the Spanish language.

R.B.W. should be exposed to native Spanish speakers; his English-speaking foster mother, unless she is extremely fluent in Spanish, would pronounce words with an English/American accent. Optimally exposure to Spanish speakers would take the form of live interaction but could be supplemented, if necessary, with video tapes, music with Spanish lyrics, and audio tapes.

### RECOMMENDATION

It is recommended that [R.B.W.] spend considerable time with his natural mother in a comfortable neutral setting. It is expected that Spanish will be spoken during these interactions. This plan will allow [R.B.W.] to develop bonds and language competencies in case he does return to his natural mother. [R.B.W.], from all reports, takes his cues from those around him. If the adults concerned are comfortable with this arrangement and do not try to sabotage it, it is expected that [R.B.W.] will be comfortable too.''

Moriearty testified Trout's conclusion that R.B.W.'s being aggressive, having nightmares, and being difficult to deal with is attributable to the earlier severing of attachments is not supported by the literature. R.B.W. has done well in attaching to people, and the literature indicates it is the persons who have not learned to attach to persons early who have subsequent problems. Since R.B.W. has demonstrated an ability to attach in the past, he probably has a predisposition to attach easily. She believes there must be something unusual going on for R.B.W. to be acting aggressively around Cobieya and her son, and she would inquire whether a parent figure is reinforcing this type of behavior by not correcting it and perhaps he believes he is acting as someone wants him to act in this situation. Since he is being told he is not a bad boy, his foster parents may be telling him his actions are appropriate.

"Stress inoculation" refers to the ability to cope with a stressful situation because of having previously experienced a similar stressful situation. In addition, children have internal stress-handling mechanisms, and others can help make a smooth transition as well. Moriearty did not believe this now four-year-old had determined that Cobieya is threatening the stability of his current situation. She also opined that a one-hour-per-week visit is not sufficient if there is a plan to reunite R.B.W. with his natural mother. The time together should be increased as much as possible. They should also work with a therapist to provide assurance to R.B.W.

Subsequent to her report, Moriearty spoke with two Spanish-speaking psychologists about the issue of language acquisition, and

they agreed with the conclusions contained in Moriearty's report. R.B.W.'s behavior of mocking Cobieya, as testified to by Ingram, is a learned behavior.

On cross-examination, Moriearty agreed that to remove R.B.W. from the care of the Tamburinis would cause R.B.W. to experience a feeling of loss and it would require time for him to cope with that fact. But she did not believe it would be any more difficult for R.B.W. than for any other child, and a transition would be helpful, providing multiple attachments. The cross-cultural difference would make it more difficult.

Moriearty viewed Trout's educational and professional background information and concluded therefrom that Trout was not a psychologist since Trout had none of the qualifications that would enable her to use the title legally in Illinois or any other State whose qualifications are known to Moriearty. Trout's list of possibilities that could happen to R.B.W. was generally a list of things that happen later to children who have not attached. At this point, that has no application to R.B.W. and probably would not in the future.

On March 7, 1989, the trial court entered the order from which this appeal was taken, finding: Cobieya is a fit and proper individual to maintain the custody of the minor child after the parties have been reunited pursuant to the order of the court; based upon the evidence presented, the minor child is a dependent minor, and the dependency is not the result of physical abuse inflicted by Cobieya; and it is in the best interests of the minor child that he be reunited with Cobieya. The trial court then set the following schedule to enable R.B.W. to be returned to the exclusive care, custody and control of Cobieya on December 31, 1989: (1) within seven days of the entry of the order, R.B.W. shall be advised of the fact that Cobieya is his mother; effective March 1, 1989, R.B.W. shall have daily contact with Cobieya from Monday through Friday for a period of two hours over the lunch hour and Cobieya shall use her best efforts during these periods of visitation to make the minor child familiar with the Spanish language; commencing July 1, 1989, Cobieya shall have additional visitation with the minor child every other weekend from Saturday at 9 a.m. to Sunday at 7 p.m.; commencing October 1, 1989, Cobieya shall have such additional visitation with the minor child as she feels is in the best interests of the minor child, after consultation with representatives of DCFS; and until December 31, 1989, DCFS shall continue to act as the temporary guardian of the minor child. At the discretion and direction of DCFS, Cobieya is to participate in parenting classes.

■■ On appeal three issues are raised. These issues are: (1)

whether the putative mother is barred by section 8(a) of the Illinois Parentage Act of 1984 (Ill. Rev. Stat. 1987, ch. 40, par. 2508(a)) from asserting her rights to the child; (2) whether the putative mother has the burden of proving she is the mother of the child; and (3) whether the findings of the trial court that the putative mother is the child's natural mother, had not deserted the child, had not failed to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare, and that the best interests of the child are served by reunification with the mother rather than adoption by respondents were against the manifest weight of the evidence. Not raised in this appeal is the question of whether the State courts have jurisdiction over the question of return of an illegal alien or whether this is an area preempted to the United States Immigration and Naturalization Service (INS) and the Federal courts. Since this question was not raised, we consider the question waived for purposes of this appeal.

Before discussing the remaining issues, it should be noted that this has been a very troubling case for this court, as it undoubtedly was for the trial court. There are a number of factors which have compounded the difficulty of the case. First, DCFS, in its zeal to do what is best for the child, instead of immediately returning this indisputably illegal alien child to Mexico through INS, exercised its jurisdiction through the courts of Illinois. This caused procedural difficulties in that evidence concerning the birth of the child which would have been available to Mexican authorities was unavailable to the Illinois courts and beyond Cobieya's means to produce in Illinois. In addition, it is the failure to return the child to Mexico immediately which caused the bicultural dilemma in which the child has become trapped. Add to this the experts ignoring the fact that "culture" is learned, not inherited, and recommending the child be exposed to the Hispanic culture through non-Hispanic foster parents even though, if the child was ultimately to be adopted, his culture would be that of his adoptive parents, not the culture of his natural parents with whom he would no longer have contact. It might be otherwise, of course, if the child had been raised in an Hispanic environment for a sufficient period of time so as to become conscious of his Hispanic origin. In any event, we must take the case as we find it.

■■■ Parental rights and responsibilities are matters of deep human importance and will not be lightly terminated. Parental rights may be terminated if the parent is adjudicated unfit for one or more of the grounds listed in section 1(D) of the Adoption Act. (Ill. Rev. Stat. 1987, ch. 40, par. 1501(D); Ill. Rev. Stat. 1987, ch. 37, par. 802—29(3); *In re Paul* (1984), 101 Ill. 2d 345, 461 N.E.2d 983.) In order for

the trial court to find parental unfitness, there must be clear and convincing evidence to support such a finding. (*Paul,* 101 Ill. 2d 345, 461 N.E.2d 983.) However, the question on review is whether the finding of the trial court is against the manifest weight of the evidence. (*In re Boolman* (1986), 141 Ill. App. 3d 508, 491 N.E.2d 1.) It is not the function of the reviewing court to reweigh the evidence or reassess the credibility of the witnesses. Great deference is given to the findings of the trial court since the judge had the opportunity to view the witnesses and evaluate the testimony. (*In re Brown* (1981), 86 Ill. 2d 147, 427 N.E.2d 84.) For the finding to be against the manifest weight of the evidence, the opposite result must be clearly evident from the review of the evidence. *Stone v. City of Arcola* (1989), 181 Ill. App. 3d 513, 536 N.E.2d 1329.

Based on the evidence before this court, it is clear Cobieya deserted her child when she sold him. There can be no other conclusion. And, therefore, the trial court should have considered adoption by the foster parents because of the bonding which has occurred since the child was placed with the foster parents.

■■ ■ Desertion has a broader meaning than mere physical separation. (*In re Deerwester* (1971), 131 Ill. App. 2d 952, 267 N.E.2d 505.) Desertion connotes conduct which indicates an intention to permanently terminate custody over the child while not relinquishing all parental rights. (*In re Adoption of Mantzke* (1984), 121 Ill. App. 3d 1060, 460 N.E.2d 80.) As *Mantzke* points out, the crucial question is whether Cobieya intended to desert R.B.W. The evidence, including Cobieya's own testimony, clearly establishes she intended to permanently give up custody of R.B.W. to Bette Winks for purposes of adoption, even though Cobieya testified she thought she could retain some contact with the child through Winks. As a result, the trial court's failure to terminate parental rights on the ground of desertion is against the manifest weight of the evidence and the decision must be reversed.

Having reversed on the ground of desertion, this court need not consider the remaining issues raised on review. For the foregoing reasons, the order of the circuit court of McLean County is reversed and the cause is remanded for a further dispositional hearing.

Reversed and remanded.

GREEN and McCULLOUGH, JJ., concur.