121 Ill. App.3d 1060 (1984)
460 N.E.2d 80
In re ADOPTION OF MICHELLE SUE MANTZKE, a Minor, et al. (Dennis N. Meyerhofer et al., Petitioners-Appellants,
v.
Katherine Meyerhofer Massion, Respondent-Appellee).
No. 83-522.
Illinois Appellate Court  Second District.
Opinion filed February 1, 1984.
Rehearing denied March 15, 1984.
*1061 Robert A. Bush, of Bush & Bush, of Mount Prospect, for appellants.
James W. Richardson, of Nack, Richardson & Kelly, of Galena, for appellee.
Judgment affirmed.
JUSTICE REINHARD delivered the opinion of the court:
Petitioners, Dennis and Judith Meyerhofer, appeal from an order granting the motion of respondent, Katherine Meyerhofer Massion, to vacate a judgment for adoption in favor of petitioners as it applied to the minor children, Edward Jay Meyerhofer and Jacquelyn Kay Meyerhofer, and denying petitioners' petition to adopt those two minor children. Respondent does not appeal from the judgment of adoption of John Baukley Meyerhofer, an adult male, by petitioners in these same proceedings below.
Petitioners raise two issues on appeal: (1) whether the trial court *1062 committed reversible error in its ruling to vacate the judgment of adoption entered December 29, 1982; and (2) whether the trial court committed reversible error when it denied the adoption of the two minor children of the parties.
 1 While counsel for respondent has filed what is labeled as a "courtesy brief," it does not comply with the requirements of Supreme Court Rule 341(f) (87 Ill.2d R. 341(f)) and will be stricken. This case will therefore be reviewed under the guidelines set forth in First Capitol Mortgage Corp. v. Talandis Construction Corp. (1976), 63 Ill.2d 128, 345 N.E.2d 493.
Petitioners filed a petition for adoption on August 20, 1982, alleging in count I that they were married and wished to adopt Michelle Sue Mantzke, born October 9, 1967, and that Judith was Michelle's natural mother and consented to the adoption while Danny Lloyd Van Houten, the natural father, was an unfit parent making his consent unnecessary. (The court later granted the adoption of this child and no appeal was taken from this judgment.) Count II alleged that petitioners wished to adopt John Baukley Meyerhofer, born on August 27, 1963, Edward Jay Meyerhofer, born on March 1, 1966, and Jacquelyn Kay Meyerhofer, born February 19, 1968, that the children were in the custody of and resided with petitioners, that Dennis was the natural father of these three children and consented to the adoption, that Katherine Meyerhofer Massion, the natural mother, had abandoned and deserted her children for a period in excess of five years and had failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the children, and that Katherine Meyerhofer Massion was thus an unfit parent and her consent to the adoption was unnecessary.
The court appointed a guardian ad litem to represent the children. At a hearing held on December 29, 1982, counsel for respondent stated that while he had notified his client of the hearing date, he had found out she was in Wisconsin and could not be reached by telephone. The trial court denied a motion for a continuance, but stated that counsel could contact his client within 30 days and "assuming proof is sufficient today, * * * you'll have the right to open it up."
Petitioners presented evidence at the hearing which showed that following the dissolution of the marriage of Dennis Meyerhofer and respondent, Dennis was awarded custody of the three children from that marriage, John Baukley, Edward Jay, and Jacquelyn Kay. Respondent was given visitation rights. Dennis subsequently married Judith in 1970, and the children resided with both of them. Since 1977, respondent had not exercised her visitation rights, had not sent the *1063 children any cards or presents, and had not called Dennis or Judith concerning the health or schooling of the children. The three children had signed consents to be adopted. Edward testified that he and his older brother had gone to visit respondent two or three years earlier but that respondent had not contacted them since then. Both Edward and Jacquelyn testified that they wished to be adopted.
The trial court found respondent unfit by reason of desertion and failure to maintain a reasonable degree of interest, concern or responsibility as to the children's welfare, and judgment of adoption for John, Edward, and Jacquelyn was entered for petitioners on December 29, 1982.
Respondent filed a motion to vacate on January 12, 1983, asserting four separate grounds to set aside the judgment. The trial court stated it would grant the motion to vacate and allow respondent to present evidence because it had previously denied a motion to continue the trial with the understanding that such a motion could be filed within 30 days of the judgment. Since the birth certificates on the adoption judgment were being processed "in Springfield," the court then indicated it would not formally vacate the judgment then, but would allow respondent to present evidence on the merits of the adoptions at a subsequent hearing.
At that hearing on the motion to vacate, respondent testified that after her divorce in 1968 from Dennis Meyerhofer, she exercised her visitation rights. She began to notice the children experiencing stress from going back and forth between parents. The children frequently expressed a desire to live with her. Respondent stated that the children told her they were not allowed to mention her or what they had done over the weekend when they went home. The petitioners told her that there was a discipline problem after the children returned from visits and blamed respondent's leniency, although respondent claimed that her present husband was extremely strict with the children. His excessive strictness, in fact, bothered her.
She related that she had come from a divorced family where she was torn between both parents and she did not want her children to suffer that same experience. She chose to give up her visitation rights until the children were of an age that they could visit or call on their own, without any stress or feelings of guilt. She said she explained her feelings at the time to the children and told them that she loved them, that she would always be there if they needed her for anything, and that they could contact her on their own. She felt the children were in a good home with their father.
She further testified that she ran a store and that the children *1064 came by the store twice when she was not there. Jackie had called three or four times over the years, although respondent said in the background on each of those calls she heard another child threatening to tell on Jackie for making the call. She ran into the boys once while on a trail ride. John stopped by the store once when he needed her signature to join the Air Force. She said that she never refused to see them, never intended to give up her rights as their mother, and did not understand why an adoption was necessary when older children were involved. At the time she stopped visitation, her minister suggested that she write her children letters whenever she felt like it, keep them, and some day she could give them to the children. She stated she did write and keep these letters and also kept newspaper clippings about the achievements of the children.
On cross-examination, respondent testified that although she lived in a substantially large house after her remarriage, she did not try to obtain custody because her new marriage needed a chance to become cemented. Her new husband did not like the travel involved in picking up and returning the children. Respondent lived in Freeport and the children and the petitioners in Elizabeth, about 35 miles away. Respondent admitted that the petitioners loved the children and raised them as best as they could. She said that when she told Judy Meyerhofer of her decision not to see the children anymore when Judy came to pick up the children's belongings, Judy was upset and could not understand how respondent could do that to the children. Respondent said she did not send any birthday or Christmas cards or presents, or have any communication for six years with the children because that would have been against her unilateral agreement not to interfere in the children's lives. She admitted that the children did not agree to this. She never called their schools to find out how they were doing. If there had been a problem, she could have terminated the nonvisitation. She conceded that she opted to take in the children of her husband and exclude her own children from her household.
Respondent stated that her husband did not love the children and she felt someone who did not love them should not discipline them. She said that she and her husband would have arguments during visitation. While she lived in a house that could accommodate the children, she never sought custody because her husband would not have permitted it. She did not make any attempt to contact the children after they came to her shop when she was not there.
Respondent's brother, Timothy Lowry, testified that John had inherited a ranch worth about $500,000 from his grandmother and that the three children, along with his three children, would split the remainder *1065 of the estate after graduating from college or reaching a certain age. He confirmed that when he and respondent were children they experienced problems being from a divorced family and respondent didn't want to put the children through that. Respondent talked with him before she made her decision to stop seeing her children.
John Baukley Meyerhofer testified that five or six years earlier respondent told the children that she would not see them anymore. He said that one of the reasons was that it was causing problems between respondent and her husband, but could not remember the other reasons. He remembered the two of them fighting over the children a lot of the time. He also recalled respondent saying that their grandmother was dead and would not be "hassling her anymore" because the grandmother wanted the children to live with respondent or at least see her more often.
Other witnesses testified, but their testimony will not be set out as it does not add to the material facts already adduced.
The trial court found that the prima facie case at the original hearing as to respondent's intent was rebutted by her testimony as to what her actual intent was and that there was insufficient proof of unfitness so as to deprive her of her rights as the natural mother of the children. The motion to vacate the previous judgment of adoption was granted as it pertained to Edward and Jacquelyn, and the petition to adopt then was denied.
Petitioners first contend that the trial court committed reversible error by granting the respondent's motion to vacate the judgment of adoption of the two minor children where the basis for that order of vacation was the intent of respondent not to give up her parental rights to the children which was not one of the grounds specially alleged in the motion to vacate.
 2 In a nonjury case, a post-trial motion to vacate a judgment filed within 30 days of entry of judgment is addressed to the trial court's sound discretion. (Ill. Rev. Stat. 1981, ch. 110, par. 2-1203; In re Marriage of Hopkins (1982), 106 Ill. App.3d 135, 137, 435 N.E.2d 897; In re Marriage of Christianson (1980), 89 Ill. App.3d 167, 171-72, 411 N.E.2d 519.) Here, the trial court had previously stated at the time it denied the motion to continue the trial that respondent would have the right "to open it up," should adoption be granted, within 30 days. Furthermore, while the motion to vacate does not expressly allege as a ground that her intent was not to give up her parental rights, respondent did allege she did not abandon or desert the children by agreement with the petitioners, and it was in the best interest of the children at the time which would be shown at *1066 a hearing. Under these circumstances, and no prejudice to petitioners having been shown, we find no abuse of discretion in the granting of the motion to vacate.
The second issue, as presented by petitioners, is whether the trial court committed reversible error in denying the adoption of the two minor children. The pivotal question is whether the finding below that respondent was not an "unfit person" was against the manifest weight of the evidence.
The Adoption Act provides in relevant part:
"Except as hereinafter provided in this Section, consents shall be required in all cases, unless the person whose consent would otherwise be required shall be found by the court, by a preponderance of the evidence, to be an unfit person as defined in Section 1 of this Act, or the parent of an adult sought to be adopted." (Ill. Rev. Stat. 1981, ch. 40, par. 1510.)
The Act further defines "unfit person" as follows:
"D. `Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption, the grounds of such unfitness being any one or more of the following:
(a) abandonment of the child;
(b) failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare;
(c) desertion of the child for more than 3 months next preceding the commencement of the Adoption proceeding; * * *."
(Ill. Rev. Stat. 1981, ch. 40, par. 1501(D).)
Together, these provisions require that a natural parent who refuses to consent to the adoption of his child, as here, must be shown to be unfit under one of the statutory grounds set forth.
The case law is well established in defining the statutory bases upon which a person may be found to be an "unfit person" by reason of abandonment, desertion, and failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare. Abandonment means conduct on the part of a parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. (Stalder v. Stone (1952), 412 Ill. 488, 495-96, 107 N.E.2d 696; In re Adoption of Garrison (1981), 93 Ill. App.3d 670, 672-73, 417 N.E.2d 787.) Desertion is distinguishable from abandonment and connotes conduct on the part of a parent which indicates an intention to permanently terminate custody over the child but not to relinquish all parental duties and claims. (In re Adoption of Markham (1981), 91 Ill. App.3d 1122, 1125, 414 N.E.2d 1351; In re Overton (1974), 21 Ill. App.3d 1014, *1067 1018, 316 N.E.2d 201.) Unfitness by reason of failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare is self-explanatory, and it is the parent's efforts to carry out parental responsibilities, rather than their success, which should be considered. In re Taylor (1975), 30 Ill. App.3d 906, 907-10, 334 N.E.2d 194.
An adoption severs the rights and interests of the natural parents; it permanently terminates the legal relationship between parent and child. (In re Abdullah (1981), 85 Ill.2d 300, 306, 423 N.E.2d 915; In re Jones (1975), 34 Ill. App.3d 603, 607, 340 N.E.2d 269.) While formerly clear and convincing evidence was required to support a finding of "unfitness" (In re Adoption of Garrison (1981), 93 Ill. App.3d 670, 673, 417 N.E.2d 787), the statute has been amended and now requires proof by a preponderance of the evidence.[1] (Ill. Rev. Stat. 1981, ch. 40, par. 1510.) The crucial determination in cases alleging abandonment or desertion is whether the parent intended to either abandon or desert the child. (In re Sanders (1979), 77 Ill. App.3d 78, 84, 395 N.E.2d 1228; In re Overton (1974), 21 Ill. App.3d 1014, 1018, 316 N.E.2d 201.) The findings of the trial court in an adoption proceeding will not be disturbed on review unless contrary to the manifest weight of the evidence. In re Adoption of Garrison (1981), 93 Ill. App.3d 670, 417 N.E.2d 787.
While these principles of law are well established, the facts presented here are unique and have not been addressed in prior Illinois decisions. This case brings into issue the conflict which arises in the parent-child relationship caused by a dissolution of marriage where the former spouses remarry to others, the noncustodial spouse assumes a new family and responsibilities, and the child or children of the former marriage are legally subject to visitation by the noncustodial parent.
The trial court found that respondent's actual intent was to do what was in the best interests of her children. The court further found that her decision to forego both visitation and other contact with the children, as initiated by her, on her belief that this avoided conflict and "hassles" harmful to the children, was sincere. There is no directly contradictory evidence of her express intent.
The essence of respondent's trial testimony was that she came from a divorced family and problems arose from going back and forth between *1068 her father and mother which was hard on her as a child; that she noticed during the visitations the children were under stress, and learned that problems arose with the children after visitations; that her new husband was strict with the children and did not have a close relationship with them; that after eight years of visitation, she saw the children were under greater stress; that the children were in a good home with their father and his present wife; that it was best for the children to receive their education, religion, and have life with their father until they were of an age to visit her on their own without any stress and feelings of guilt by their desire to visit their natural mother; that she never chose to give up her rights as a mother although she had ceased visitation and contact for almost six years; that she told the children at the time she ceased visitation and contact with them why she was making this decision and that she would always be there if they needed her for anything and could contact her on their own; that several times Jackie telephoned her while she was out, and she heard this created problems; and that she never refused to see the children.
Respondent's oldest son John, now an adult, in part corroborated respondent's testimony, and testified he remembered when his mother informed them she would not see them anymore, but did not remember her reasons except that it was causing problems for his mother and her husband.
 3 Previous decisions in determining unfitness have stressed that the intent of the parent is of paramount importance. (In re Sanders (1979), 77 Ill. App.3d 78, 84, 395 N.E.2d 1228; In re Overton (1974), 21 Ill. App.3d 1014, 1018, 316 N.E.2d 201.) While there is direct evidence of a complete lack of visitation for six years and no other form of communication or correspondence with the children initiated by respondent, her expressed intent at trial was not to give up her rights as a parent for the reasons set forth above. The trial court found her intent was not to permanently give up her parental rights to her children and unfitness had not been proved. There is evidentiary support for this conclusion in the record. Even though respondent chose to forego visitation and contact with the children initiated by her, she told them she would always be there if they needed her for anything, she talked with one child several times by telephone, and, on one occasion, did assist her eldest son in signing a form to enlist in the Air Force. There is no evidence that she ever requested to care for the children or assist in their upbringing or support. Her intent was not to relinquish her parental duties or claims. Rather, she ceased her visitation and contact with the children out of a concern and interest in the children's well being. Whether her reasoning was misdirected is not the issue. She also knew *1069 that the children were well cared for in her former husband's home. In addition, the failure of the respondent to challenge the father's custody of the children does not demonstrate her intent permanently to terminate custody. (See In re Adoption of Vienup (1976), 37 Ill. App.3d 217, 345 N.E.2d 742 (Simon, J., dissenting).) Accordingly, we do not find the decision of the trial court to be against the manifest weight of the evidence.
 4 We emphasize that we affirm the decision of the trial court on the peculiar facts and circumstances presented in this record and the findings made by the trial court. Our opinion can in no way be taken as approbation of respondent's decision. We also make no determination whether respondent was correct in her conclusion that the children were better off not to see or hear from her. No testimony, expert or otherwise, was presented below on that issue. Nor do we have any evidence in this record that the children sought or needed the care, attention or custody of their mother. Although the children here consented to their adoption by petitioners, absent consent or unfitness of the parent, an adoption cannot be granted solely because it may be in the best interest of the child. (In re Jones (1975), 34 Ill. App.3d 603, 607, 340 N.E.2d 269.) Of course, should the children still wish to be adopted when they become adults in a short while, consent of the respondent then is not required.
For the foregoing reasons, we affirm the judgment of the circuit court of Jo Daviess County.
Affirmed.
HOPF and NASH, JJ., concur.
NOTES
[1] Public Act 83-138, effective Sept. 26, 1983, amended this section again back to a clear and convincing standard. (See also Santosky v. Kramer (1982), 455 U.S. 745, 71 L.Ed.2d 599, 102 S.Ct. 1388.) The court below applied a clear and convincing evidence standard, and thus the result here is not affected by the amendment nor raised as an issue by the parties.