SECOND DIVISION
April 26, 2007

No. 1-06-2739

| | | |
|---|---|---|
| *In re* ADOPTION OF C.A.P., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (J.M. and L.A.D., | ) | Cook County. |
| | ) | |
| Petitioners-Appellees, | ) | |
| v. | ) | Honorable |
| R.P., | ) | Marsha D. Hayes, |
| Respondent-Appellant). | ) | Judge Presiding. |
| | ) | |

JUSTICE SOUTH delivered the opinion of the court:

Respondent, R.P., appeals from orders of the circuit court of Cook County which found him unfit, terminated his parental rights with respect to his minor daughter, C.A.P., and granted petitioners J.M. and L.A.D.'s petition for adoption of the child. On appeal, respondent contends the circuit court's unfitness finding was against the manifest weight of the evidence. Further, respondent contends the circuit court erred in barring his witnesses during the fitness hearing and granting petitioners' adoption petition.

## BACKGROUND

Respondent and petitioner L.A.D. were married on October 12, 1995. At that time, respondent was in the Navy, stationed in Virginia, and petitioner was attending college in Illinois. Shortly thereafter, respondent left the Navy and returned to Illinois. The parties then moved into respondent's parents' home, during which time C.A.P. was born on July 16, 1996. She has remained in petitioner's custody since birth. Respondent and L.A.D. were separated in September 1996, due to respondent's military arrest, and remained so even after his return in

October 1996. It was during that time that L.A.D. and C.A.P. moved into her parents' home. At that time, L.A.D.'s father was the chief of the Chicago Heights police department. Shortly thereafter, petitioner filed for divorce.

While respondent was in the naval brig, he spoke with L.A.D. on a daily basis and expected to be reunited with petitioner and his daughter. During the divorce proceedings, respondent visited with C.A.P. regularly. A final judgment for dissolution of marriage was entered in 1998, granting full custody of C.A.P. to petitioner and granting respondent weekly visitation for one hour at the Human Enrichment Center in Chicago.

Respondent subsequently remarried in June 1998, and he and his new wife have three children. Respondent adopted his new wife's son from a previous relationship in 2000, and they reside in Byron, Illinois, which is approximately three hours south of Chicago.

Petitioner L.A.D. married petitioner J.M. in July 2001, and they have two children. C.A.P. lives with petitioners and their family in Homewood, Illinois.

Petitioners filed their petition to adopt C.A.P. on March 30, 2005, and thereafter filed an amended petition to adopt C.A.P. on June 7, 2005, alleging that respondent had abandoned C.A.P. in excess of three months and failed to maintain a reasonable degree of interest, concern, or responsibility as to her welfare.

During the adoption proceedings, respondent was served with a request to produce and a request to admit facts and genuineness of documents. The court entered an order requiring the disclosure of witnesses by October 14, 2005. Respondent filed and served his preliminary witness list on October 20, 2005, without any objection from the petitioners.

Prior to the commencement of the fitness hearing, respondent filed a petition for a rule to show cause and a finding of indirect civil contempt against petitioner L.A.D. in the domestic relations division. Respondent was seeking visitation with C.A.P. under the terms of the divorce degree. Petitioner L.A.D. sought to dismiss the petition, but the trial court would not dismiss it. Subsequently, the trial judge in the domestic relations court contacted the trial judge in the adoption proceedings, and respondent was admonished for attempting to enforce his visitation rights.

The fitness hearing commenced on March 22, 2006. Respondent appeared with the witnesses which were listed on his witness list, but petitioners made a motion to bar any witnesses other than respondent, alleging that his witness disclosures violated Supreme Court Rule 213(f) (177 Ill. 2d R. 213(f)). The trial court granted petitioners' motion, and the hearing continued. At the close of the fitness hearing on March 27, 2006, the trial court made an oral ruling, stating in part:

> "The Court finds that the Petitioners have proven by clear and
> convincing evidence that [R.P.] abandoned his child in excess of
> three months and failed to maintain a reasonable degree of interest,
> concern, and responsibility as to the child's welfare. The Court
> further finds that [R.P.] is an unfit person."

A written order to that effect was entered on March 29, 2006.

A best interests hearing was held on August 15, 2006, to determine whether R.P.'s parental rights should be terminated, and whether it was in C.A.P.'s best interests that she be

1-06-2739

adopted by petitioners. At the close of the hearing, the trial court gave an oral ruling terminating respondent's parental rights and granting the amended petition to adopt. A final written judgment for adoption was entered on August 17, 2006. This appeal followed.

ANALYSIS

On appeal, respondent contends that: (1) the trial court's finding that he was unfit was against the manifest weight of the evidence; (2) the trial court's granting of the amended petition to adopt was against the manifest weight of the evidence; and (3) the trial court abused its discretion in barring respondent's witnesses during the fitness hearing.

When a petition for adoption alleges that a parent is unfit, abrogating the need for that parent's consent to the adoption (Regan v. Joseph P., 286 Ill. App. 3d 889, 892 (1997)), our supreme court has held that, under circumstances such as those presented in this case, trial courts must undertake a two-step process in ruling on adoption petitions. In re Adoption of D.A., 222 Ill. App. 3d 73, 75 (1991), citing In re Adoption of Syck, 138 Ill. 2d 255, 276 (1990). The first step is to determine whether the parent whose parental rights petitioners are seeking to terminate is unfit. Syck, 138 Ill. 2d at 276. At this stage, it is the parent's past conduct that is under scrutiny; evidence of whether allowing the adoption would be in the child's best interests is not to be considered. Syck, 138 Ill. 2d at 276. If the court determines that petitioners have met their burden of establishing by clear and convincing evidence the existence of one or more grounds for unfitness, it must then determine whether termination of parental rights and allowance of the adoption petition would be in the child's best interests. Syck, 138 Ill. 2d at 277.

The Adoption Act (Act) provides in relevant part:

-4-

1-06-2739

"(a)  Except as hereinafter provided in this Section consents or surrenders shall be required in all cases, unless the person whose consent or surrender would otherwise be required shall be found by the court:

(1) to be an unfit person as defined in Section 1 of this Act, by clear and convincing evidence."  750 ILCS 50/8(a)(1) (West 2004).

The Act further defines "unfit person" as follows:

"D.  'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption, the grounds of such unfitness being any one or more of the following:

(a) Abandonment of the child.

\*\*\*

(b) failure to maintain a reasonable degree of interest,

."  750 ILCS 50/1(D)(a), (b) (West 2004). child's welfare

Together, these provisions require that a natural parent who refuses to consent to the adoption of his child, as here, must be shown to be unfit under one of the statutory grounds set forth.  In re Adoption of Mantzke, 121 Ill. App. 3d 1060, 1066 (1984).

"A finding of unfitness as the basis for termination of parental rights will not be disturbed unless it is against the manifest weight of the evidence, *i.e.*, unless an opposite conclusion is

clearly apparent." Regan, 286 Ill. App. 3d at 892. "Great deference is given to the trial court's decision, since the trial court's opportunity to evaluate the parties credibility and the evidence is superior to that of the reviewing court." Regan, 286 Ill. App. 3d at 892.

In the instant case, the trial court found respondent unfit based upon abandonment and failure to maintain a reasonable degree of interest, concern, or responsibility for C.A.P.'s welfare. In so finding, the trial court made no factual findings but merely stated that petitioners had proven respondent's unfitness by clear and convincing evidence, specifically that respondent had abandoned C.A.P. for more than three months.

The case law is well established in defining the statutory bases upon which a person may be found to be an "unfit person" by reason of abandonment and failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare. Mantzke, 121 Ill. App. 3d at 1066. Abandonment means conduct on the part of a parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. Mantzke, 121 Ill. App. 3d at 1066. There is no time limit as to the abandonment, and it must be presumed that the abandonment is meant as a final act. In re Adoption of Walpole, 5 Ill. App. 2d 362, 367 (1955). "The crucial determination in cases alleging abandonment or desertion is whether the parent intended to either abandon or desert the child." Mantzke, 121 Ill. App. 3d at 1067.

"Unfitness by reason of failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare is 'self-explanatory,' and it is the parent's efforts to carry out parental responsibilities, rather than their success, which should be considered." Mantzke, 121 Ill. App. 3d at 1067. Circumstances that warrant consideration when deciding whether a

parent's failure to personally visit his or her child establishes a lack of reasonable interest, concern or responsibility as to the child's welfare include the parent's difficulty in obtaining transportation to the child's residence, the parent's poverty, the actions and statements of others that hinder or discourage visitation, and whether the parent's failure to visit the child was motivated by a need to cope with other aspects of his or her life or by true indifference. Syck, 138 Ill. 2d at 279. "If personal visits with the child are somehow impractical, letters, telephone calls, and gifts to the child or those caring for the child may demonstrate a reasonable degree of concern, interest and responsibility, depending on the content, tone and frequency of those contacts under the circumstances." Syck, 138 Ill. 2d at 279.

Each case concerning parental unfitness is *sui generis*, unique unto itself. Syck, 138 Ill. 2d at 279. However, reason and the principle of *stare decisis* "dictate at least a minimal comparison of decisional fact patterns." Davis v. Bughdadi, 120 Ill. App. 3d 236, 243 (1983). Such a comparison reveals that "where the courts of our State have upheld the finding of a parent's unfitness on the ground of failure to maintain a reasonable degree of interest, concern, or responsibility as to a child's welfare, or in cases where a contrary finding has been reversed, the parents involved have made comparatively fewer attempts to contact their children over comparatively longer periods." Davis, 120 Ill. App. 3d at 243.

We now turn to the merits of this case. The trial court found that petitioners had proven respondent unfit by reason of abandonment in excess of three months and by failure to maintain a reasonable degree of interest, concern, or responsibility by clear and convincing evidence. Upon a careful review of the evidence presented at the unfitness hearing, we find petitioners did not

1-06-2739

prove respondent abandoned C.A.P. by clear and convincing evidence or failed to maintain a reasonable degree of interest, concern, or responsibility.

Here, the minor child C.A.P. was born on July 16, 1996. At that time, petitioner L.A.D. and respondent were married. In September 1996, respondent was arrested and placed in naval custody out of state. Shortly thereafter, L.A.D. took C.A.P. and moved into her parents' home. While in custody, respondent spoke with L.A.D. daily and upon his release and subsequent discharge in October 1996, respondent expected to be reunited with L.A.D. and C.A.P. However, petitioner instead filed for divorce shortly thereafter. Respondent visited with C.A.P. regularly during the divorce proceedings. A final judgment for dissolution of marriage was entered in May 1998, granting respondent supervised visitation of one hour weekly at the Human Enrichment Program in Chicago.

The record reveals that a number of events occurred since the parties' separation in 1996 and their subsequent divorce which hindered or prevented respondent from visiting with C.A.P. As previously noted, L.A.D.'s father was, at that time, the chief of police in Chicago Heights. In that capacity, L.A.D.'s father had respondent arrested on at least two occasions prior to the finalization of the divorce when he attempted to visit with C.A.P. while L.A.D. was living in her parents' home. Both times, the charges were dismissed, and respondent subsequently became afraid of being arrested or imprisoned by his former father-in-law. Respondent testified that he still avoids traveling to Cook County whenever possible. Moreover, the record reveals that respondent filed and won a lawsuit against L.A.D.'s father for harassment and false imprisonment related to at least one of these incidents.

Respondent testified that during the divorce proceedings, he always appeared for his visitation with C.A.P., but petitioner would make it difficult for him to do so. According to respondent, petitioner would terminate the visitation at the "slightest perceived infraction," and even denied him the opportunity to take a photograph with C.A.P. and his new wife and son during a visitation at the Markham courthouse. That was the last time respondent saw C.A.P.

Respondent also testified that from 1998 through the filing of petitioners' petition for adoption, he did not know of C.A.P.'s whereabouts. Petitioner L.A.D. testified that she and the child moved at least four times and that she never notified respondent of her contact information because she was not required to do so under the divorce decree.

The record also reveals that respondent was adjudged disabled from injuries incurred in a car accident in 1995, which prevented him from obtaining steady gainful employment. Consequently, respondent's financial resources have been limited, and he has been dependent on welfare and unemployment for several years. Even with his new wife's earnings, he has consistently lived at or below the poverty level.

In terms of respondent's living arrangements since his divorce from petitioner L.A.D., initially he lived with his extended family in Mount Morris, Illinois, which is approximately three hours from Chicago. Respondent testified that it would have been financially difficult or impossible for him to make the trip each week for an hour of visitation, coupled with his fear of being in Cook County because of petitioner's father. Respondent had also been diagnosed with posttraumatic stress disorder, which may have played a part in his perception that his former father-in-law could have him arrested if he traveled to Cook County to visit with his daughter.

1-06-2739

Respondent further testified that despite not being able to visit with C.A.P., he thought about her everyday, sent her cards and gifts to his former in-laws' home and had amassed gifts for her over the years that he was hoping to give to her one day. As mentioned previously, respondent visited with C.A.P. at all of his scheduled visitations during the divorce proceedings and agreed to visit her at his in-laws' home as long as his father-in-law was not present; however, his father-in-law refused to be absent from his home. According to respondent's testimony, between 1999 and 2005 he unsuccessfully conducted Internet searches to locate petitioner and his daughter and contacted several attorneys in an attempt to enforce his visitation with C.A.P. but never had the funds to pursue it. Respondent only learned of petitioner's whereabouts when he received the petition at issue, and at that time he wrote to her expressing his refusal to consent to C.A.P.'s adoption and indicated he wanted to visit his daughter and provide support for her; however, petitioner never responded. Respondent further testified that he spent time researching facilities where he could visit with his daughter under the terms of the divorce decree and located such a facility, but petitioner refused to cooperate with visitation. Subsequently, respondent filed a petition for rule to show cause and a finding of indirect civil contempt against petitioner in an attempt to enforce his visitation. Respondent testified he believes he is a good father to his children and wants to have a relationship with C.A.P.; he keeps pictures of her on his wall at home.

Respondent's attempts to provide financial support were rejected by petitioner, who stated she did not want his money. He testified that as a 100% disabled veteran, he receives benefits and listed C.A.P. as a dependent so that she could receive benefits, including health

1-06-2739

insurance from Veteran's Affairs and Social Security. Respondent was unable to complete the process because he did not know where she was living but has since completed the paperwork now that he has an address for C.A.P.

Conversely, petitioners argue that respondent had numerous avenues available to locate L.A.D. and his daughter had he "made the slightest effort." Specifically, petitioners contend that respondent could have located L.A.D. through her parents' address and through her employer; that L.A.D.'s name was listed on the title to two homes in Cook County as well as on bank accounts, credit cards, and tax records; and C.A.P. was enrolled in public school in Cook County. Petitioners also contend that L.A.D. never tried to hide her whereabouts. Further, petitioners contend that respondent did not provide financial support when he knew L.A.D. was in bankruptcy, when he received a settlement of his lawsuit against his former father-in-law, or when he received extra money in 2005 in settlement of his disability lawsuit. We note that petitioner does not address the fact that she never provided her contact information to respondent, other than stating that she was not required to do so under the divorce decree, or that she and her father hindered respondent's visitation.

Moreover, we find nothing in the record which suggests that respondent intended to abandon C.A.P. when, in fact, all of the evidence is to the contrary. Contrary to the trial court's finding, there is no time period as to abandonment (Walpole, 5 Ill. App. 2d at 367), and the inquiry must focus on whether it was the parent's intent to abandon the child (Mantzke, 121 Ill. App. 3d at 1067). No such intent is present here because respondent has always intended to be a part of C.A.P.'s life but was prevented from doing so. "Where a parent's attempt to see a child

-11-

1-06-2739

has been officially frustrated, it is the intent to establish and/or maintain contact with the child rather than actual contact which is determinative." Regan, 286 Ill. App. 3d at 893.

Nor have petitioners proven that respondent had a lack of interest or concern about C.A.P. As a result of the parties' divorce, the care and custody of the child was granted to the mother. It was undisputed at the hearing that respondent exercised or attempted to exercise visitation throughout the years. It was also undisputed that petitioner never notified respondent of her whereabouts or encouraged visitation between respondent and C.A.P. This would indicate, at a minimum, that petitioner wished to make visitation difficult, despite her assertions that with a little effort she could have been found. As this court noted in Davis, "the fact that a custodial parent denies or hinders the visitation rights of a noncustodial parent may be a significant element weighing against the clear and convincing determination of the noncustodial parent's indifference to his or her child." Davis, 120 Ill. App. 3d at 243. As we further noted in Davis, if respondent had been notified of petitioner's whereabouts and then failed to act on this information, that could reasonably be viewed as evidence of a lack of serious interest in the child. Davis, 120 Ill. App. 3d at 243.

Moreover, there is nothing in the record to show that the mother desired or would have accepted any contribution from respondent for support of C.A.P.; in fact, the record shows that on one particular occasion when respondent gave L.A.D. a check, she ripped it up and said she did not want his money. There was evidence that gifts for C.A.P. were thrown away by petitioner, prompting respondent to hold onto any future gifts until he was able to give them to his daughter himself.

-12-

1-06-2739

In sum, the record does not support the trial court's conclusion that respondent was unfit based on abandonment or failure to maintain a reasonable degree of interest, concern, or responsibility, and we find that such a conclusion was against the manifest weight of the evidence.

Since we conclude that respondent was not an unfit parent, we also reverse the grant of petitioners' petition for adoption. It follows then that respondent must consent to C.A.P.'s adoption before it can become final. See Mantzke, 121 Ill. App. 3d at 1069. Due to our disposition of this issue, we need not address respondent's issue concerning his witnesses at the fitness hearing.

Accordingly, we reverse the judgment of the circuit court which found respondent an unfit parent and terminated his parental rights and the judgment which granted the petition for adoption.

Reversed.

HOFFMAN and HALL, JJ., concur.