NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2019 IL App (4th) 190426-U

NO. 4-19-0426

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 15, 2019
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* Adoption of J.J, a Minor, | ) | Appeal from the |
| (Jack D. and Jodi D., | ) | Circuit Court of |
|       Petitioners-Appellees, | ) | Macon County |
|       v. | ) | No. 18AD13 |
| John J., | ) | |
|       Respondent-Appellant). | ) | The Honorable |
| | ) | Thomas E. Little, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court affirmed the judgment of the trial court that terminated re-
spondent's parental rights because the trial court's findings were not against the
manifest weight of the evidence.

¶ 2   Respondent, John J., is the father of J.J. (born February 2010) and G.J. (born July

2011). In October 2018, the trial court found respondent was an unfit parent, and in May 2019, it

found termination of respondent's parental rights would be in the minors' best interests. Re-

spondent appeals, arguing that the trial court's (1) fitness determination and (2) best-interest de-

termination were against the manifest weight of the evidence. We disagree and affirm the trial

court's judgment.

¶ 3                          I. BACKGROUND

¶ 4                      A. The Petition for Adoption

¶ 5   In March 2018, petitioners Jodi D. and Jack D. filed a petition for adoption, which

alleged (1) Jodi was the biological mother of J.J. and G.J., (2) Jodi had married Jack in August 2017, and (3) Jodi consented to his adoption of both children. The petition further alleged respondent was the biological father of the children and was currently in the Macon County jail. The petition asserted respondent was unfit and his parental rights should be terminated because respondent had (1) abandoned the children and (2) failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare for a period in excess of two years.

¶ 6        Later in March 2018, respondent *pro se* filed an answer denying he was an unfit parent or that his parental rights should be terminated. Subsequently, respondent sent a letter to the trial court indicating (1) he was currently incarcerated in the Macon County jail and (2) he desired an attorney but could not afford one. In May 2018, the trial court conducted a first appearance hearing. The court appointed an assistant public defender to represent respondent.

¶ 7                              B. The Fitness Proceedings

¶ 8        In October 2018, the trial court conducted a termination hearing regarding respondent's parental fitness. 750 ILCS 50/1(D)(b) (West 2016).

¶ 9                              1. *Petitioners' Case*

¶ 10       In petitioners' case-in-chief, Jodi testified she was the mother of the minor children, who were born in 2010 and 2011, and had been married to Jack since August 2017. She was formerly married to respondent. She filed for divorce in 2013, and a circuit court entered a judgment of dissolution of marriage in 2014 granting Jodi sole custody of both children and reserving the issue of visitation. Jodi stated she completed a "transparenting class as a part of that case" and, to her knowledge, respondent did not, which is why the issue of visitation had to be reserved. As far as she was aware, respondent never filed anything in the divorce case regarding visitation, nor did anyone on his behalf.

- 2 -

¶ 11 Jodi further testified that she left respondent in January 2013 and took the children with her. Since then, respondent had not (1) seen the children, (2) contacted Jodi to see the children, (3) provided any financial or material support, or (4) sent the children letters, birthday cards or gifts, or Christmas cards or gifts.

¶ 12 Jodi acknowledged that respondent visited J.J.'s school unannounced and met with him in 2017. Jodi testified as follows:

> "Last year [respondent] went to [J.J.]'s school because he had got [a] report [J.J.] had a black eye he got from school. Whenever I went to the school, [J.J.] said he had seen [respondent] and asked him who he was. He said he was his dad, and [J.J.] said he turned around and went back to class because he was scared."

¶ 13 Jodi testified that in 2015 she filed a petition for an order of protection and listed herself and the children as protected parties. Respondent appeared and requested the children not be included as protected parties because he wished to seek visitation. Jodi stated that the court in that case informed respondent that he still needed to complete the parenting class, "and he would have to file for visitation at another time and he still hasn't done nothing." Jodi further stated the order of protection was extended in 2017 and she was unaware of any filing in that case in which respondent sought visitation. Jodi said she had not heard from a lawyer or any third party concerning visitation. She denied doing anything to prevent respondent from having visitation and stated she had been living at the same address for the past four years.

¶ 14 Jodi testified that she was on Facebook but she had blocked respondent from being able to contact her because of the order of protection. However, Jodi was friends with respondent's sister and stated they communicated once every three to five months to talk about how their children are doing. Jodi denied receiving any Facebook messages from anyone

requesting respondent be allowed to see the children or for him to provide financial support for them.

¶ 15        On cross-examination, Jodi acknowledged that the children were on the emergency order of protection entered in the 2015 case and they were removed as protected parties a little over six weeks later, after the plenary order of protection was entered. (The emergency order of protection was entered on June 29, 2015, and the plenary order of protection was entered on August 12, 2015.) Jodi agreed that the order of protection prevented respondent from contacting her directly or indirectly about seeing the children, but she maintained he could have filed documents with the court. Jodi stated she had not been contacted by respondent's relatives, his sister, his girlfriend, Ashley Fulk, or Jack about allowing visits with the children.

¶ 16        Following this testimony, petitioners rested.

¶ 17                    2. *Respondent's Case*

¶ 18        Ashley Fulk testified that she had been dating respondent since July 2015 and the two had lived together in the past. Fulk stated she drove respondent to J.J.'s school when he found out about the bruise on J.J.'s face. Fulk further stated respondent texted Jack about the situation but Jack told respondent "that Jodi said he wasn't allowed to see the boys."

¶ 19        On cross-examination, Fulk stated the text exchange occurred either in 2015 or 2016. Fulk acknowledged that respondent had been arrested for various felonies (most commonly aggravated battery of a pregnant person) in 2015, 2016, 2017, and 2018. Fulk was the victim or a witness in several of those cases, at least one of which resulted in a plea agreement and conviction.

¶ 20        Jack D. testified he was a petitioner in the case and believed he was a fit and proper person to adopt the children. Jack admitted that he had been convicted of a felony in 2006

and another in 1997. Jack further admitted he spent 61 days in prison in 2009. He testified that he did not recall respondent ever trying to contact him. Jack indicated he did not remember Fulk's version of events regarding respondent's efforts to contact Jack.

¶ 21      Respondent then asked the trial court to "take judicial notice of Macon County case No. 13-F-34, more specifically the actions that occurred in that case on February 14 of 2013 and April the 1st of 2013." The court stated as follows:

"I will take judicial notice of the contents of those two docket entries only. On February 14, the docket entry reads: Plaintiff personally present pro se. Defendant personally present in custody of the sheriff. Motion by the plaintiff for a continuance to seek counsel, motion allowed. Cause allotted for appearance of counsel. Appearance of counsel set for April 1, 2013 at 9:00 in courtroom 3A. And then on April 1, 2013: Plaintiff personally present in custody of the sheriff. Defendant personally present pro se. Visitation shall be as follows: A) plaintiff to have children every other weekend commencing Friday 6:00 p.m. to Sunday 6:00 p.m. April 26, 2013; B) plaintiff to have children every Thursday commencing May 2, 2013, 7:00 a.m. to 2:00 p.m. That's the contents of both of those entries."

¶ 22      Respondent testified that prior to the entry of the divorce decree, he had been granted visitation in Macon County case No. 13-F-34. Thereafter, a divorce decree was entered that reserved the issue of visitation. Respondent stated he subsequently filed a motion in the 13-F-34 case asking for further visitation. Respondent offered, and the trial court received, a copy of that motion into evidence in the instant adoption case. Respondent stated that at the time he filed the motion (which is dated August 3, 2017) in the 13-F-34 case, he was not allowed to have contact with Jodi. The motion requested that the clerk send a copy of the motion to Jodi.

¶ 23        On cross-examination, respondent acknowledged he was in the Macon County jail at the time he filed the motion. He stated he thought filing the motion was enough to get Jodi a copy and to have a hearing. Respondent admitted he had been in prison since the motion was filed. He further admitted he had never taken the required parenting class.

¶ 24        Respondent admitted he had been in and out of prison since 2013 for various offenses. He explained that the periods of time that he was out were short and he did not have the money to pay the fee for the class, and that was why he did not complete it. Respondent acknowledged he was served in the divorce case and he never filed any motions seeking visitation in that case. Respondent stated the motion admitted into evidence was the only thing he filed.

¶ 25        Respondent admitted he had not seen G.J. since 2013 and he had only seen J.J. once since 2013. Respondent stated the reason he had not seen them was because Jodi would not let him. Respondent further stated he tried to send clothes and money to the children by giving them to his sister to deliver. Respondent said Jodi's "response to my sister was we don't want nothing from him." He explained he chose that method of trying to contact his children because Jodi had an order of protection against him and his children were seven and eight years old. Respondent stated "[t]hat happened in 2015 and then periodically from time to time I have messaged Jack asking if I could see my kids, if he could talk to her, and every time it's—it went nowhere."

¶ 26        On redirect, respondent stated he made "[a]t least seven" attempts to contact Jack to see the children since 2015. Respondent rested.

¶ 27        Petitioners argued that they had proven respondent was unfit for failing to maintain a reasonable degree of interest or concern in the children. Respondent had not really made

any effort to maintain contact or a relationship with the children and had only filed a single motion in 2017 in an attempt to get visitation. Petitioners acknowledged respondent was in and out of prison, but they contended this demonstrated respondent had spent his time out of jail committing crimes instead of trying to have a relationship with his children.

¶ 28 Respondent argued that he had maintained a degree of interest and his efforts to have a relationship had been effectively frustrated by Jodi. Respondent received a visitation order in the 13-F-34 case, but the court entered an order reserving the issue of visitation just a year later while respondent was in prison. Additionally, Jodi's 2015 order of protection essentially prevented him from contacting the children or setting up visitation because the children were so young. Respondent acknowledged he only filed the one motion for visitation while in prison, but he maintained his lack of legal sophistication was the reason.

¶ 29 3. *The Trial Court's Findings*

¶ 30 The trial court began by noting that petitioners had the burden of proving by clear and convincing evidence either one of the two grounds of unfitness alleged. The court stated that paragraph seven of the petition alleged respondent was unfit for (1) abandoning the children and (2) "failing to maintain any reasonable degree of interest, concern, or responsibility as to the children's welfare for a period in excess of two years." The court then stated as follows:

> "Court finds that *** the petitioners have proven by clear and convincing evidence that the [respondent] is an unfit parent for the reasons set forth in paragraph 7 of the petition.
>
> In support of my decision, I do find the testimony of [Jodi] to be credible. He's had almost no contact with these kids for years. I don't find based on the testimony that I heard that although there was an order of protection that this in any

- 7 -

way prohibited him from seeing these children.

He could have gone through the court. The fact that he was in and out of [prison] is a matter of his own creation so I do find that he is an unfit parent."

¶ 31                    C. The Best-Interests Proceedings

¶ 32        In May 2019, the trial court conducted proceedings regarding whether it was in the minor children's best interests to terminate respondent's parental rights. Jodi testified consistently with her prior testimony regarding the amount of contact respondent had with the children. That is, Jodi testified respondent had essentially never contacted the children either personally or through another person since he last saw them in 2013. Jodi testified that the children were one and two when respondent last saw them.

¶ 33        Jodi further testified that she began dating Jack in January 2014. She introduced the children to him gradually, beginning two months after they began dating. Jack moved in with Jodi in April 2014, and the two were married in August 2017.

¶ 34        Jodi stated Jack and the children had formed a bond since they have been residing together. Jack takes the children on bike rides, to the park, and regularly visits them at school. Jodi reported Jack had "never missed any student parent teacher conferences. He's always there with the [children]." Jodi stated the children refer to Jack as "dad" and agreed they had a "genuine loving bond and close connection." Based on her observations of their interactions, Jodi had no concerns and believed they loved each other.

¶ 35        Regarding respondent, Jodi testified the children do not ask to see him or how he is doing. The last time either boy asked about respondent was when respondent unexpectedly showed up at J.J.'s school. Jodi explained that J.J. did not recognize respondent and asked her who he was. Jodi "told him that [respondent] was his biological father, and [J.J.] said he was

scared and he just turned around and went back to class."

¶ 36          On cross-examination, Jodi admitted respondent obtained an order for visitation in 2013, but she repeatedly denied that she had prevented respondent from having visitation or from contacting the children. She also admitted she obtained an order of protection in 2015 that included the children, but she explained the children were subsequently removed and respondent could have (1) filed something in court or (2) contacted the children through Jack or his sister. Jodi denied that respondent's sister had ever spoken to her about respondent seeing the children other than telling Jodi "it's best that [respondent] doesn't see the kids."

¶ 37          Jack testified that the children were "[l]ike they're my own. It didn't start out that way but here recently—well, the last four or five years we've gotten better, you know I'm more daddy than I am Jack." He stated the children originally called him "Jack" but naturally, over time, they started calling him "dad." Jack testified that he taught the boys how to ride bikes, he takes them fishing and to the park, and they do "just everything my dad did with me." Jack stated he and Jodi had a four-year-old girl together and he treats J.J. and G.J. the same way he treats his biological daughter.

¶ 38          Jack further testified that he had never received any mail, letters, cards, or packages addressed to the children from respondent or anyone in respondent's family in the five years he lived with Jodi. Jack stated he had spoken with the children about his adopting them and they were excited to change their last names and wanted to be adopted.

¶ 39          Nina Walker testified she was in a relationship with Jodi's father and had lived with him for the past four years. Based upon that relationship, Walker had become familiar with Jodi, Jack, and their children. Walker stated she sees them about once a week be it at each other's houses or in public. Walker testified J.J. and G.J. have a father-son relationship with Jack

and they call him "dad." The children and Jack display affection towards each other, and Walker believed they had a "close loving relationship." Walker had seen Jack discipline the children but never saw any inappropriate or concerning behavior. Walker had never heard the children speak about respondent.

¶ 40 Ruby Henderson was the last witness to testify for petitioners. Henderson testified she was the director of the after-school program for the YMCA in Decatur, Illinois, and had worked in that capacity for 25 years. She knew petitioners and the children, who had been in the program for the past two years. Henderson stated she was surprised when she was asked to testify in the case because she did not realize Jack was not the children's biological father.

¶ 41 Henderson testified that Jack picks the kids up daily and they are always "excited" to see each other. Henderson stated she or other staff at the YMCA have had to inform Jack when the children have misbehaved and Jack has contacted them about behavior problems. Jack was receptive when informed of any incidents. Henderson stated she had seen Jack interact with the children when they got in trouble. Henderson explained that the children did not have "tremendous behavior problems," and were in fact "happy, well-behaved, well-adjusted little kids." Henderson stated she was a "mandated reporter" and had never seen anything that gave her concerns or made her feel like she should contact DCFS or law enforcement.

¶ 42 Respondent testified on his own behalf. He testified that he lived with Jodi for between three and four years after the children were born. Respondent acknowledged that he was arrested and spent a few months in county jail for driving under the influence of alcohol (DUI), after the children were born, but he did not spend time in prison. He and Jodi separated before he went to prison and got divorced while he was in prison.

¶ 43 Respondent stated he did not contest the divorce and believed that the issue of

- 10 -

custody had been set aside. The first time after the divorce that visitation came up was during the order of protection proceedings. Respondent was in prison between January 2013 and July 2015. During that time, Jodi never brought the children to see him. Respondent stated he wrote Jodi once a month asking about the children but she did not respond.

¶ 44		Respondent explained that he had filed for custody of the children in 2013 before he went to jail. However, he went to jail for a DUI during the proceedings. Nonetheless, while he was in jail, he was able to get an order for visitation in the custody case. In May 2013, respondent went from jail to prison, which was in a different county. Jodi never honored the visitation order, nor did she respond to his several requests for her to bring the children to see him.

¶ 45		Respondent testified that between 2013 and 2014, he spoke with his children on the phone when they were visiting respondent's father on the weekends, which occurred frequently. Respondent also sent them Christmas gifts and birthday cards. In 2015, he asked his sister to speak with Jodi, but his sister reported back that Jodi told her "she didn't want nothing to do with" respondent. Respondent explained that he was trying to find out the children's shoe and clothing size so he could purchase them clothes, but he could not speak with Jodi because she had filed for an order of protection. Respondent stated he was served with the order of protection the day before he was released.

¶ 46		Respondent stated he was present in August 2015 when the children were removed from the order of protection, but Jodi never let him see the children. Respondent explained he did not try to enforce the visitation order he had in place because he did not know it was still in effect. Respondent stated he asked to see the children several times and spoke with Jack. Respondent tried to call Jack and contact him on Facebook.

¶ 47		Respondent testified that his plan was to save money for an attorney to help him

get visitation but he ended up getting arrested. Respondent said he went back to prison in November 2015 for domestic battery. He was released in March 2016 but went back for domestic battery. Respondent stated he filed a motion for visitation in 2017. He explained he did not know he had to do anything else to get a hearing until he appeared in the instant adoption case. Respondent was expecting to be released in February 2020.

¶ 48　　　On cross-examination, respondent admitted he was guilty of DUI but denied that he had committed any of the domestic violence offenses. Respondent admitted he pleaded guilty, but he claimed he did so because his attorney advised him he would receive a longer sentence if he went to trial. Respondent claimed the victim in those cases, a mother of a different one of respondent's children, lied because he was cheating on her. Respondent stated that he cared about his children and he loved them. He stated that if he did not care, he would have ignored the adoption case and would not have bothered to fight it.

¶ 49　　　The trial court found that it was in the children's best interests to terminate respondent's parental rights. The court explained that it found the petitioners' witnesses, including the petitioners themselves, to be credible. The court stated it had reviewed the factors listed in 705 ILCS 405/1-3 (4.05) (West 2016). The court stated it found the most applicable factors to be "the children's sense of attachment, where they feel a sense of love, being valued, their sense of security, their sense of familiarity and continuity, and the least disruptive placement for the children." The court also considered the "children's need for permanence including their need for stability and continuity of relationships with parent figures and with siblings and other relatives" to be particularly important.

¶ 50　　　The court noted that the testimony presented by the petitioners particularly reflected that terminating respondent's parental rights was in the children's best interest. The court

found those witnesses to be credible and found that they all testified that Jack had a strong bond with the children and acted as their father. The court noted Jack and Jodi had a daughter and Jack treated the children the same as his biological child. The court found Henderson to be "very credible" and noted she testified that they children were "very happy and well-adjusted."

¶ 51    The trial court also noted that it believed that respondent was sincere and telling the truth that he loved his children and cared about them. The court also did not believe his criminal history was particularly relevant to the issue before the court. Nonetheless, the court believed respondent had not established that there was much of a "sound and stable relationship" between respondent and the children. Accordingly, the court found it was in J.J. and G.J.'s best interest to terminate respondent's parental rights.

¶ 52    This appeal followed.

¶ 53                                   II. ANALYSIS

¶ 54    Respondent appeals, arguing that the trial court's (1) fitness determination and (2) best-interest determination were against the manifest weight of the evidence. We disagree and affirm the trial court's judgment.

¶ 55                        A. Appellees' Failure To File a Brief

¶ 56    We initially note that petitioners have not filed a brief in this appeal. A reviewing court will not act as an advocate for a party who fails to file an appellate brief. *Diane P. v. M.R.*, 2016 IL App (3d) 150312, ¶ 9, 55 N.E.3d 208. However, when the record is clear and the claimed errors can be decided without the aid of an appellate brief, a reviewing court should decide the appeal on the merits. *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133, 345 N.E.2d 493, 495 (1976). Because these criteria apply here, this court will proceed to the merits of this case.

¶ 57                          B. The Fitness Determination

¶ 58          Respondent argues the trial court's findings that petitioners proved both grounds of unfitness by clear and convincing evidence were against the manifest weight of the evidence. It is well settled that "[a]s the grounds for unfitness are independent, the trial court's judgment may be affirmed if the evidence supports the finding of unfitness on any one of the alleged statutory grounds." *In re H.D.*, 343 Ill. App. 3d 483, 493, 797 N.E.2d 1112, 1120 (2003). Based on our review of the record, we conclude that the trial court's finding that respondent failed to maintain a reasonable degree of interest, concern, or responsibility for the welfare of the children was not against the manifest weight of the evidence. Accordingly, we discuss only that finding.

¶ 59                          1. *The Standard of Review*

¶ 60          A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make. *In re Richard H.*, 376 Ill. App. 3d 162, 165, 875 N.E.2d 1198, 1201 (2007). A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re D.D.*, 196 Ill. 2d 405, 417, 752 N.E.2d 1112, 1119 (2001). A decision is against the manifest weight of the evidence when the opposite conclusion is clearly the proper result. *In re Nylani M.*, 2016 IL App (1st) 152262, ¶ 48, 51 N.E.3d 1067.

¶ 61                          2. *Reasonable Progress*

¶ 62          The adoption of a minor child generally requires the consent of both parents. 750 ILCS 50/8(a) (West 2016). However, consent is not required if the trial court finds, by clear and convincing evidence, a parent to be an unfit person, as defined by the Adoption Act. *Id.* The burden is on those petitioning for adoption to prove parental unfitness. *In re Adoption of L.T.M.*, 214 Ill. 2d 60, 67-68, 824 N.E.2d 221, 226 (2005). Section 1(D)(b) of the Adoption Act defines an

unfit person as a parent who fails "to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2016). "Unfitness by reason of failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare is self-explanatory, and it is the parent's efforts to carry out parental responsibilities, rather than their success, which should be considered." (Internal quotation marks omitted.) *In re Adoption of C.A.P.*, 373 Ill. App. 3d 423, 428, 869 N.E.2d 214, 219 (2007). "The parent may be found unfit for failing to maintain either interest, or concern, or responsibility; proof of all three is not required." *In re Richard H.*, 376 Ill. App. 3d at 166.

¶ 63     The First District, relying on the supreme court's decision in *In re Adoption of Syck*, 138 Ill. 2d 255, 562 N.E.2d 174 (1990), has set forth the circumstances to consider when determining whether a parent has failed to maintain a reasonable degree of interest or concern as follows:

> "[T]he parent's difficulty in obtaining transportation to the child's residence, the parent's poverty, the actions and statements of others that hinder or discourage visitation, and whether the parent's failure to visit the child was motivated by a need to cope with other aspects of his or her life or by true indifference. *Syck,* 138 Ill. 2d at 279, 562 N.E.2d 185. 'If personal visits with the child are somehow impractical, letters, telephone calls, and gifts to the child or those caring for the child may demonstrate a reasonable degree of concern, interest and responsibility, depending on the content, tone and frequency of those contacts under the circumstances.' *Syck,* 138 Ill. 2d at 279, 562 N.E.2d 185." *C.A.P.*, 373 Ill. App. 3d at 428.

Cases of parental unfitness are *sui generis*; however, comparison to similar cases is a valid

consideration. *Id.* "Such a comparison reveals that 'where the courts of our State have upheld the finding of a parent's unfitness on the ground of failure to maintain a reasonable degree of interest, concern, or responsibility as to a child's welfare, or in cases where a contrary finding has been reversed, the parents involved have made comparatively fewer attempts to contact their children over comparatively longer periods' " *Id.* (quoting *Davis v. Bughdadi*, 120 Ill. App. 3d 236, 243, 458 N.E.2d 177, 181 (1983)).

¶ 64                    3. *The Trial Court's Finding in This Case*

¶ 65         Here, the trial court found Jodi's testimony to be credible. Jodi testified that respondent had not seen G.J. at all since 2013 and only saw J.J. once, when he unexpectedly appeared at school. Even then, J.J. did not know who respondent was and was afraid of him. Further, Jodi testified that respondent had not sent gifts, letters, cards, or other financial assistance to the children since she left in January 2013. Although respondent testified that he attempted to contact the children through Jack and attempted to give them clothes and money through his sister, Jodi and Jack denied such attempts were ever made. The trial court believed Jodi that no efforts were made, and respondent's failure to present any evidence corroborating his efforts supports her statements. Nothing in the record suggests the trial court's decision to credit petitioners' testimony was improper.

¶ 66         Further, although petitioners bore the burden of proof by clear and convincing evidence, the trial court clearly could have believed (and did) that they met that burden and accepted Jodi, Jack, and Fulk's testimony as true. Fulk testified to only two instances of contact by respondent: (1) the school visit and (2) texts to Jack. Even if the trial court believed respondent, by his own admission, he testified that he attempted to contact Jack just seven times since 2015. He only asked his sister one time to give clothes and money to his kids via Jodi. The trial court

specifically found "[respondent has] had almost no contact with these kids for years." In short, irrespective of the fact that his attempts at communication were unsuccessful, his sheer lack of attempts demonstrates a lack of reasonable degree of interest.

¶ 67      Additionally, although respondent had obstacles that made maintaining an interest in his children more difficult, those obstacles were not insurmountable or unrelated to his own behavior. The trial court also specifically found that the order of protection did not "in any way prohibit[ ] him from seeing these children," because respondent "could have gone through the court." The court also noted that "[t]he fact that he was in and out of [prison] is a matter of his own creation." These findings were not against the manifest weight of the evidence. Although respondent could not visit the children in person, he could have attempted other forms of communication such as written correspondence and phone calls. To the extent he needed court assistance to establish these methods of communication, he could have filed motions in his divorce case, which the court that entered the order of protection told him was a necessary step to receive visitation. Respondent also filed a motion for visitation in the 2013 family case. However, he filed the motion only in 2017 and never followed up to ensure the matter was heard. Although prison is not an easy place to live, respondent had plenty of time to write the children and figure out the proper legal mechanism for obtaining visitation or regular communication.

¶ 68      Based upon the foregoing, we conclude the trial court's determination that respondent failed to maintain a reasonable level of interest or concern for J.J. and G.J.'s welfare was not against the manifest weight of the evidence.

¶ 69      C. The Best-Interest Determination

¶ 70      1. *The Applicable Law and Standard of Review*

¶ 71      At the best-interest stage of a termination proceeding, the State bears the burden

of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 290-91 (2009). In reaching a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072, 859 N.E.2d 123, 141 (2006); see also 705 ILCS 405/1-3(4.05) (West 2016).

¶ 72 A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in the superior position to view the witnesses and judge their credibility. *In re Jay. H.*, 395 Ill. App. 3d at 1070. An appellate court "will not reverse the trial court's best-interest determination unless it was against the manifest weight of the evidence." *Id.* at 1071. A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the trial court should have reached the opposite result. *Id.*

¶ 73 2. *This Case*

¶ 74 The evidence presented at the best interest hearing (and summarized by the court in its oral ruling) clearly supports a finding that it was in J.J. and G.J.'s best interest to terminate

- 18 -

respondent's parental rights. Jodi testified that the children called Jack "dad" and that he was the only dad they had known. She stated that they had lived together for four years and had established a loving relationship. Jack was actively involved in the children's lives. Jack testified similarly and stated he did everything with J.J. and G.J. that his father had done with him. Moreover, as the trial court noted, Jodi and Jack had a four-year-old daughter together and Jack treated J.J. and G.J. the same way he treated his biological child.

¶ 75 Walker testified she was in a long-term relationship with Jodi's father and saw petitioners and the children regularly. Walker noted that the children never spoke of respondent and treated Jack as their father. Henderson testified that she was surprised to learn Jack was not the children's biological father. He always picked them up, was involved in their care and discipline, and the children had happy, healthy, and normal lives. Henderson also noted she was required by law to report certain types of conduct to DCFS and law enforcement, had been director of the after-school program for 25 years, and had no reservations about the way Jack interacted with the children.

¶ 76 By contrast, respondent had spent the vast majority of his children's lives in prison. Although it is true Jodi got an order of protection against respondent in 2015, his children were only included in the order for six weeks. He had not seen the children at all since 2013 and only saw J.J. once when he unexpectedly showed up at school and J.J. did not recognize him. Respondent testified he sent cards and gifts to the children in 2013 and 2014 and requested Jodi bring them to visit him in prison but she refused. In short, even given the context that it was admittedly difficult for respondent to maintain contact with the children, the undisputed record shows that he had no ongoing relationship with them at all. Accordingly, we conclude the trial court's finding that it was in J.J. and G.J.'s best interest to terminate respondent's parental rights

was not against the manifest weight of the evidence.

¶ 77    We thank the trial court for its careful consideration of the testimony and detailed oral findings, which this court found particularly helpful to the resolution of this case.

¶ 78                                    III. CONCLUSION

¶ 79    For the reasons stated, we affirm the trial court's judgment.

¶ 80    Affirmed.