2023 IL App (1st) 230275-U

No. 1-23-0275

Order filed September 6, 2023

THIRD DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| *In re* ADOPTION OF E.W. | ) | |
| | ) | |
| | ) | Appeal from the Circuit Court |
| (NAYIBE ARZUZA and KEVIN CATALANO, | ) | of Cook County. |
| | ) | |
| | ) | No. 2021 COAD 000180 |
| Petitioners-Appellants, | ) | |
| | ) | Honorable |
| v. | ) | Maureen O. Hannon |
| | ) | Judge, Presiding |
| NICHOLAS WILLIAMS, | ) | |
| | ) | |
| Respondent-Appellee.) | ) | |

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice Reyes and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held:* The trial court's denial of a finding of unfitness was not against the manifest weight of the evidence. Affirmed.

¶ 2    This appeal arises from a petition for adoption. Petitioners, Nayibe Arzuza and Kevin Catalano, sought to adopt minor E.W., who is Nayibe's biological son. Respondent, Nicholas Williams, who is E.W.'s biological father, did not consent to the adoption. Petitioners sought

a finding of unfitness against respondent. The trial court found that petitioners failed to establish unfitness by clear and convincing evidence and dismissed the petition for adoption. For the following reasons, we affirm.

¶ 3                                        I. BACKGROUND

¶ 4       Nayibe and respondent were previously married and E.W. was born during that marriage. A judgment for dissolution of marriage was entered March 10, 2016. The custody judgment that was entered alongside the judgment of dissolution dictated that E.W. would reside with Nayibe and respondent would have parenting time every other weekend and on some holidays.

¶ 5       On April 5, 2021, Nayibe, along with her fiancé, Kevin Catalano, filed a petition to adopt E.W. Petitioners alleged that respondent had "proposed that he would consent to the adoption of [E.W.] if [petitioners] paid him the sum of $100,000.00" and that "[t]his 'offer' was officially transmitted to [Nayibe] in writing directly by [respondent]." Nayibe further alleged that she "sought to confirm that [respondent] was offering to sell [E.W.] for adoption which he did, via text." Nayibe informed respondent that his proposal was illegal, but that she would agree to cover all costs related to the adoption. Respondent subsequently agreed to that proposal. Petitioners included with the petition for adoption an exhibit consisting of screenshots of a text conversation.

¶ 6       Although the petition makes no mention of the screenshots, subsequent testimony made clear that the messages were an alleged text message conversation between Nayibe and respondent regarding his alleged proposal. Included in the text conversation is a photograph of a letter with a header reading "For Settlement Purposes Only – For Settlement Purposes Only." The letter also contained a footer providing legal disclaimers regarding confidentiality. The

body of the letter describes it as "an all or nothing settlement proposal" with the following terms:

"1. Ms. Arzuza and her significant other (Mr. Kevin Catalano) will pay to Mr. Williams the sum of $100,000.

2. Upon receipt of $100,000 USD payment in full, Mr. Williams will sign off on surrendering his parental rights.

3. Ms. Arzuza waives her right to retroactive support, arrears or future child support from Mr. Williams;

4. Child support shall be abated or suspended during the adoption proceedings;

5. Ms. Arzuza [*sic*] significant other (Mr. Kevin Catalano) can then begin commence [*sic*] adoptions [*sic*] proceedings of the minor child."

The letter contained no names outside of the above quoted terms. The accompanying text messages contained an exchange in which one sender, alleged to be Nayibe, asked a series of clarifying questions and the other sender, alleged to be respondent, replies and clarifies that the proposal was his own, not that of either parent's lawyer, and he wished to reach a settlement to avoid further litigation. Nayibe asked whether the payment and abatement of child support would be the entirety of the payment and no further payments would be requested "even if at times you visit E.W. or he sees other family members of yours." Respondent confirmed that such was the case and that "E.W. is free to exist in all the worlds he has to navigate (dad's world, mom's world, grandparents/other family members world, school world, friend world, sports world, etc) *** E.W. is free to visit me at any times going forward."

¶ 7        On July 1, 2021, respondent filed a motion to dismiss the petition for adoption in which he asserted that he would not consent to the adoption. In petitioners' August 11, 2021 response to

3

the motion to dismiss, they alleged that although they had not explicitly included in the initial petition any allegation that respondent was an unfit parent, their allegations regarding the proposed offer "spoke for themselves." In the response, they alleged that respondent was an unfit parent under subsections 50/1(D)(a), (b), and (h) of the Adoption Act (750 ILCS 50/1, *et seq*. (West 2022)). These sections respectively concern "[a]bandonment of the child," "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare," and "[o]ther neglect of, or misconduct toward the child."

¶ 8        In his August 30, 2021 reply, respondent noted that the petition itself did not allege that he was an unfit parent and encouraged the court to judge based on the allegations contained within the pending pleadings. Respondent also argued that under Illinois Supreme Court Rule 408, the allegations that he offered to consent to the adoption for $100,000 should be stricken as inadmissible settlement negotiations. Respondent further argued that regardless, the facts alleged were insufficient to support a finding of unfitness under the indicated subsections.

¶ 9        On August 31, 2021, the trial court denied respondent's motion to dismiss with no articulation of its reasoning and gave respondent leave to raise the issues again in the matter.

¶ 10        The trial court subsequently held a fitness hearing on the petition. At the hearing, respondent testified that he exercised his parenting time consistently up until the COVID-19 outbreak in March 2020. He resumed his parenting time fully in June 2020 through December 2020, at which point Nayibe stopped allowing respondent to see E.W. in contravention of the standing order regarding parenting time. Respondent testified that up until December 2020, he took E.W. to soccer games and he requested phone calls with E.W. daily. Respondent continued to request calls and attempt to exercise his parenting time after Nayibe stopped allowing him to see E.W. This testimony is corroborated by message records from the

TalkingParents App that Nayibe and respondent used to communicate regarding their shared parenting of E.W. Respondent also testified that he called the police each time he was denied parenting time in contravention of the standing court order. The trial court took judicial notice of the fact that on November 2, 2021, respondent filed a petition for enforcement of allocated parenting time. Respondent testified that a hearing on that petition was held in March 2022 and the result, to his understanding, was that he was not able to see E.W. Due to that understanding, respondent has not reached out to request contact or parenting time since March 2022.

¶ 11      When asked about his alleged offer to consent to the adoption in return for a payment of $100,000, respondent denied that such an offer was made. He confirmed that he sent a letter to Nayibe offering to let Kevin adopt E.W. but denied that the letter introduced into evidence accurately reflected what he wrote. The letter introduced into evidence set out a five-part offer as detailed above in ¶ 6. Respondent confirmed that he made the offers contained in the lines numbered 3, 4, and 5, but denied making the offers contained in lines 1 and 2. Respondent also denied that he sent or received the text messages about the alleged offer that were entered into evidence. When presented with quotes from a transcript of the March 2022 proceeding regarding his parenting time in which he confirms, under oath, that he sent the letter and texted Nayibe about it, respondent consistently denied memory of giving such testimony or denied giving such testimony.

¶ 12      Nayibe testified that respondent's claims of assiduously making use of his allotted parenting time were false, that respondent has never attended a parent-teacher conference, he disappeared for six months with no contact in 2017, and his claims of seeing E.W. on a daily basis during a period when she and respondent lived in the same building were false. Nayibe

stopped allowing respondent parenting time after the alleged settlement offer because she "was always nervous" when E.W. and respondent spent time together and "was afraid to send E.W. with someone that wants money in exchange for giving him up." Nayibe also testified that respondent switched from filing police reports to attempting to enforce his allocated parenting time after he found a new attorney. Nayibe confirmed that emails from June 2019 between Nayibe and respondent's lawyers accurately represented that settlement negotiations regarding a consent to adoption were ongoing at that time. Nayibe testified that she received respondent's letter offering to consent to the adoption for payment on or around September 8, 2020. She testified that the texts in the record regarding the offer were sent between herself and respondent in a time period spanning September 9, 2020 through September 24, 2020.

¶ 13　　On December 13, 2022, the trial court entered an order finding that petitioners had failed to establish by clear and convincing evidence that respondent was an unfit parent. The trial court found unconvincing respondent's argument that his payment request was inadmissible under Rule 408 because the rule in question concerns settlement offers being used to establish liability or the value of a claim and the proposed settlement offer was not used to establish either of those things in this case. The trial court found that respondent had, in fact, made the offer to consent to the adoption in exchange for money. However, it found that Nayibe was not credible in her claim that she cut off respondent's visitation immediately after receiving the offer, as the offer was made in September 2020 and Nayibe did not stop E.W.'s contact and visitation with respondent until December 2020.

¶ 14　　Regarding abandonment, the trial court found:

　　　　"Mr. Williams was consistently involved in [E.W.'s] life by exercising his visitation, attending his sports, and bringing him around the extended family. He called

his son almost daily, including during the over two years Ms. Arzuza interfered and prohibited Mr. Williams from seeing and speaking to [E.W.]. In addition, Mr. Williams never gave up his desire to see his son or stop his visitation and attempted to enforce the same by filing police reports and by filing the motion to enforce visitation in the domestic relations proceeding.

The facts directly contradict the allegation of abandonment and petitioners did not demonstrate by clear and convincing evidence that Mr. Williams abandoned [E.W.]."

¶ 15    Regarding failure to maintain a reasonable degree of interest, concern, or responsibility as to E.W.'s welfare, the trial court found:

"The evidence presented shows Mr. Williams was eager to see his son, exercise visitation, and speak to him on the phone. That Mr. Williams was willing to take money in return for his consent for [E.W.] to be adopted by his mother and new fiancé is deplorable. However, the fact Mr. Williams acted in pecuniary self-interest does not mean he is an 'unfit parent' where the evidence demonstrates that Mr. Williams cared about his son's wellbeing and wanted to participate in his son's life, despite the offer to agree to the adoption.

Petitioners did not establish by clear and convincing evidence Mr. Williams failed to maintain a reasonable degree of interest, concern, or responsibility as to [E.W.'s] welfare."

¶ 16    Regarding other neglect or misconduct toward the child, the trial court found:

"The offer to accept $100,000 in return for consent to the adoption of [E.W.] by his mother and stepfather is unenforceable, and against public policy. *** The rationale behind this rule is that the parents' self-interests cannot be superior to the best interests

7

of their children. It is a rotten thing to seek financial gain in return for consent to adoption, but the evidence presented at trial suggests that at no time did Mr. Williams think he was putting his son in danger or harm's way. It was an adoption by the boy's mother who has been with [E.W.] all of his life and her fiancé with whom [E.W.] was currently living.

This was a hearing to determine whether Mr. Williams is an unfit parent, not what is in E.W.'s best interest. Petitioners did not demonstrate by clear and convincing evidence Mr. Williams engaged in misconduct toward [E.W.] warranting a termination of Mr. Williams' parental rights."

¶ 17     On January 25, 2023, the trial court denied the petition for adoption and granted Rule 304 language. Petitioners timely filed a notice of appeal February 8, 2023, and this appeal follows.

¶ 18                                        II. ANALYSIS

¶ 19     Petitioners argue on appeal that the trial court's finding that they failed to establish respondent's unfitness was against the manifest weight of the evidence. Petitioners argue that the evidence presented demonstrated that respondent was unfit under each of the three indicated subsections of the Adoption Act.

¶ 20     "Termination of parental rights is an extraordinary measure given the superior right of parents, against all others, to raise their children." *In re T.D.*, 268 Ill. App. 3d 239, 245 (1994). "Accordingly, abrogation of this right may not occur in the absence of clear and convincing evidence of a parent's unfitness, which must be determined prior to consideration of the children's best interests." *Id*. "A reviewing court will not disturb a court's fitness finding unless it is against the manifest weight of the evidence, *i.e.*, the record clearly demonstrates that the result opposite to the one reached by the trial court was the proper result." (internal quotation

marks omitted) *Id.* "Each case concerning parental unfitness is *sui generis*, requiring close analysis of its individual facts. Factual comparisons to other cases by reviewing courts are consequently of little value." *Id.* Both parties agree that we must review the trial court's finding under the manifest weight of the evidence standard.[1]

¶ 21    Section 8(a) of the Adoption Act requires that the parents of the child consent to any potential adoption unless the parent falls into one of several exceptions, one of which is if the parent is found by the court "to be an unfit person as defined in Section 1 of this Act, by clear and convincing evidence." 750 ILCS 50/8(a)(1). Section 1(D) provides, in relevant part, as follows:

> " 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following, except that a person shall not be considered an unfit person for the sole reason that the person has relinquished a child in accordance with the Abandoned Newborn Protection Act:
>
> (a) Abandonment of the child.
>
> * * *
>
> (b) Failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare.
>
> * * *

---

[1] Petitioners newly argue in their reply brief that the standard of review should be *de novo*, but we need not address that argument as it is long-established that "[i]t is not proper practice to raise and discuss new questions and cite authorities in support thereof in a reply brief." *Harrow v. Grogan*, 219 Ill. 288 (1905); see also Ill. Sup. Ct. R. 341(h)(7) (eff. Oct 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief.")

(h) Other neglect of, or misconduct toward the child; provided that in making a finding of unfitness the court hearing the adoption proceeding shall not be bound by any previous finding, order or judgment affecting or determining the rights of the parents toward the child sought to be adopted in any other proceeding except such proceedings terminating parental rights as shall be had under this Act, the Juvenile Court Act or the Juvenile Court Act of 1987." 750 ILCS 50/1(D) (West 2022).

¶ 22　　Petitions for adoptions must state:

"That the person or agency, having authority to consent under Section 8 of this Act, has consented, or has indicated willingness to consent, to the adoption of the child by the petitioners, or that the person having authority to consent is an unfit person and the ground therefor, or that no consent is required under paragraph (f) of Section 8 of this Act." 750 ILCS 50/5(B)(j) (West 2022).

¶ 23　　The first ground on which petitioners argue that respondent is unfit is "[a]bandonment of the child." 750 ILCS 50/1(D)(a) (West 2022). "Abandonment means conduct on the part of a parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child." *In re Adoption of C.A.P.*, 373 Ill. App. 3d 423, 427 (2007). "There is no time limit as to the abandonment, and it must be presumed that the abandonment is meant as a final act." *Id.* "The crucial determination in cases alleging abandonment or desertion is whether the parent intended to either abandon or desert the child." *Id.* "[T]he inquiry must focus on whether it was the parent's intent to abandon the child." *Id* at 431.

¶ 24　　Petitioners argue that "[i]t is hard to imagine a more clear instance of abandonment than offering to sell your parental rights to someone you've never met—which is exactly what Mr. Williams did." Their counsel refers to Mr. Williams' offer in this way in every single instance

in the proceedings below. Petitioners go further to cite to the United Nations Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution and Child Pornography.

¶ 25     This presentation misrepresents the facts of this case. As the trial court noted, "it was an adoption by the boy's mother who has been with E.W. all of his life and her fiancé with whom E.W. was currently living." It is not a good-faith interpretation of Mr. Williams' actions to equate them to child trafficking or to say he was attempting to sell his child, much less to a stranger. In repeatedly insisting on this presentation below and on appeal, petitioners' counsel has attempted to convince the court that respondent's conduct was so morally reprehensible that he deserves to lose his parental rights.

¶ 26     "When ruling on parental unfitness, a court is not to consider the child's best interests." *In re Adoption of Syck*, 138 Ill. 2d 255, 276 (1990). In *Syck*, our supreme court explained that, in complying with the legislature's intended two-step process, it is only after the trial court has found by clear and convincing evidence that a parent is unfit that the court can and will proceed to consider the child's best interests. *Id*. "At this point it is the parent's past conduct in the then-existing circumstances that is under scrutiny." *Id*. "The child's welfare and whether the child's eventual adoption by the petitioners would improve his future financial, social, and emotional atmosphere is not relevant in judging the fitness of the natural parent." *Id*.

¶ 27     The Adoption Act provides specific criteria for a finding of unfitness and the courts' task is to determine if the criteria for the grounds enumerated by the petitioner are satisfied. See 750 ILCS 50/1(D), 50/5(B)(j). A parent's moral character is not relevant to the subsections cited in the petition. Analyzing respondent's offer as the unenforceable settlement proposal that it was, we cannot find an intent to abandon E.W. The key question we must ask is whether

11

respondent's behavior evinced intent to forego all parental duties and relinquish all parental claims to E.W. *Id*. at 431. Respondent's proposed offer, just as any other adoption, would necessarily involve him relinquishing his parental duties and any parental claim to E.W. However, it is certain that the legislature did not mean to include all instances of a parent offering to consent to adoption within the ambit of abandonment. To interpret the statute in such a way would impermissibly render meaningless the statute's distinction between consent to adoption and unfitness for reason of abandonment, as they would be one and the same. *McNamee v. Federated Equipment & Supply Co. Inc.*, 181 Ill. 2d 415, 423-24 (1998) ("[A] court will avoid an interpretation of a statute that would render any portion of it meaningless or void. Also, a court presumes that the legislature, in enacting a statute, did not intend absurdity, inconvenience, or injustice.").

¶ 28    Having established the uncontroversial premise that consent to the adoption of a child does not constitute abandonment of that child, the only question that remains is whether any other features of respondent's offer evinced such an intent. The fact that respondent's consent was predicated on payment may be troubling, but it does nothing more to evince an intent to abandon the child than does the base offer. Had respondent been openly offering consent to adoption to any comers in return for money, our analysis would differ. Here, however, the offer was to consent to an adoption by E.W.'s mother's fiancé, with whom the child already lived. A finding that respondent's offer constitutes an intent to abandon E.W. based on the monetary aspect of the settlement offer would introduce a moral dimension to the question of abandonment that is unsupported by the statutory language. As such, we cannot find that the trial court's ruling that respondent was not unfit for reason of abandonment was against the manifest weight of the evidence.

¶ 29     B. Failure to Maintain a Reasonable Degree of Interest, Concern, or Responsibility

¶ 30     The second ground on which petitioners argue that respondent is unfit is "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2022). "Unfitness by reason of failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare is self-explanatory, and it is the parent's efforts to carry out parental responsibilities, rather than their success, which should be considered." (internal quotation marks omitted) *In re Adoption of C.A.P.*, 373 Ill. App. 3d at 428. "The fact that a custodial parent denies or hinders the visitation rights of a noncustodial parent may be a significant element weighing against the clear and convincing determination of the noncustodial parent's indifference to his or her child." *Davis v. Bughdadi*, 120 Ill. App. 3d 236, 243 (1983).

¶ 31     Petitioners cite to *In re Jaron Z*, 348 Ill. App. 3d 239 (2004), for the proposition that "the expression of a modicum of interest or desire to see a child does not *per se* rise to the level [of] interest and concern required under the statute." While *Jaron Z* does support that proposition, the court asserts that the parent in question did show consistent interest in the child and ruled instead based on the "responsibility" portion of the statutory language, finding that the parent's drug use and failure to comply with the dictates of a drug treatment program were sufficient for the trial court to find the parent unfit. *Id.* at 259-60. Here, no such concern exists. *In re Jaron Z* is inapposite.

¶ 32     Petitioners also cite to *Freeman v. Settle*, 75 Ill. App. 3d 799 (1979) as an example of a case in which our court has found a petitioner to be unfit under this subsection, in part based on consenting to adoption to avoid support obligations. However, in that case we cited two additional factual bases supporting the trial court's finding of failure to show a reasonable

degree of interest, concern, or responsibility: 1) "failure to inquire at [the child's] school concerning her progress demonstrates a lack of concern for the child's welfare" and 2) "most importantly, the appellant's prolonged lack of contact with [the child], despite being in close proximity to her home, indicates little, if any interest in the child." *Id*. at 802. In *Freeman*, the father did not visit his daughter for "nearly six years" and, during those years "[his] only efforts to maintain contact with [the child] consisted of mailing a few cards and presents to the child, most of which were returned unopened," and even those efforts ceased two years prior to the proceeding. *Id* at 800. Those additional factors strongly indicate a disinterest accompanying the offer to consent to adoption that is not present in the case at bar.

¶ 33    Respondent consistently exercised his allowed parenting time. He requested phone calls daily, with rare exceptions, up until Nayibe stopped allowing respondent to contact E.W. Thereafter, respondent filed police reports every two weeks, and when he switched attorneys, respondent attempted to enforce his parental rights in court. Between December 11, 2020, when Nayibe stopped allowing respondent to see E.W., and June 29, 2021, when the last TalkingParents message in the record was sent, respondent sent 347 messages that consisted of requesting visitation and phone calls, noting occasions when he did have a phone call with E.W., and occasionally attempting to address Nayibe's lack of cooperation. This is an average of 1.7 messages per day. In that same period of time, Nayibe responded only 16 times. It was not until the court ruled on respondent's petition to enforce his allocated parenting time and respondent understood that he was not allowed contact with E.W. that he ceased attempts to contact and spend time with E.W. Furthermore, the petition for adoption of concern in this appeal was filed about a month after that ruling and respondent declined to consent to the adoption. The record supports the trial court's finding that petitioners failed to show that

respondent was unfit for reason of failing to show reasonable interest, concern, or responsibility for E.W.'s welfare.

¶ 34    Petitioners argue once again that respondent's offer was despicable and demonstrated a lack of interest, but they do not explain *how* respondent's offer pertains to this particular ground for unfitness. They simply argue that "his actions amply demonstrate that he is willing to shirk his own responsibilities as a parent in exchange for his own personal financial gain." That argument goes to E.W.'s best interest, not to whether respondent has maintained sufficient interest, concern, and responsibility as to E.W.'s welfare, and is therefore inapposite. Petitioners argue that sending "perfunctory messages" in the TalkingParents App did not demonstrate continued interest, and fault respondent for not inquiring about E.W.'s well-being in his messages. The record, however, shows that respondent sent messages daily, filed police reports, and attempted to enforce his rights in court when faced with an explicitly uncooperative custodial parent. It is the parent's *efforts* to carry out parental responsibilities that are relevant. *In re Adoption of C.A.P.*, 373 Ill. App. 3d at 428. It was not against the manifest weight of the evidence for the trial court to deny a finding of unfitness based on failure to maintain a reasonable degree of interest, concern, of responsibility as to E.W.'s welfare. We affirm the trial court's decision in this regard.

¶ 35                      C. Other Neglect or Misconduct Toward the Child

¶ 36    The third and final ground on petitioners argue that respondent is unfit is "[o]ther neglect of, or misconduct toward the child." 750 ILCS 50/1(D)(h) (West 2022). Petitioners argue that respondent's offer was abhorrent, criminal, against international law, remarkably dishonest, and simply not something this court can allow. Petitioners make every effort to articulate the moral bankruptcy of respondent's actions, but make no effort to connect those actions with the

statutory language to which we are bound. The statutory language itself is not even quoted in the argument, nor is there any other legal citation relevant to the question of unfitness. Since petitioners at no point allege that any of respondent's conduct constitutes misconduct or neglect and they do not provide legal support for their argument, the argument is waived. Ill. S. Ct. R. 341(h)(7) (eff. October 1, 2020) (argument in appellate brief must be supported by citation); *People v. Ward*, 215 Ill. 2d 317, 332 (2005); *In re Marriage of Bates*, 212 Ill. 2d 489, 517 (2004) ("A reviewing court is entitled to have issues clearly defined with relevant authority cited"); *Rosier v. Cascade Mountain, Inc.*, 367 Ill. App. 3d 559, 568 (2006) (holding that, by failing to offer any supporting legal authority or reasoning, plaintiffs waived consideration of their theory for asserting personal jurisdiction over defendants); *Ferguson v. Bill Berger Associates, Inc.*, 302 Ill. App. 3d 61, 78 (1998) ("it is not necessary to decide this question since the defendant has waived the issue" by failing to offer case citation or other support as Supreme Court Rule 341 requires). "Forfeiture, however, is a limitation on the parties and not the reviewing court." *Wilson v. Humana Hosp.*, 399 Ill. App. 3d 751, 757 (2010). Since this case concerns a child and the important matter of parental rights, we will consider this argument for the sake of thoroughness.

¶ 37    Illinois case law has not provided a specific definition of neglect or misconduct under this subsection. In the one case in which our court has affirmed a trial court finding of unfitness under this subsection, the respondent did not dispute that the behavior in question fell under this subsection. See *In re Diane L.*, 343 Ill. App. 3d 419, 421 (2003). That said, the Adoption Act is to be construed in concert with the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq*. (West 2022)). 750 ILCS 50/2.1 (West 2022). The Juvenile Court Act defines a neglected minor, in relevant part as:

"(a) any minor under 18 years of age or a minor 18 years of age or older for whom the court has made a finding of probable cause to believe that the minor is abused, neglected, or dependent under subsection (1) of Section 2-10 prior to the minor's 18th birthday who is not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being, or other care necessary for his or her well-being, including adequate food, clothing and shelter, or who is abandoned by his or her parent or parents or other person or persons responsible for the minor's welfare, except that a minor shall not be considered neglected for the sole reason that the minor's parent or parents or other person or persons responsible for the minor's welfare have left the minor in the care of an adult relative for any period of time, who the parent or parents or other person responsible for the minor's welfare know is both a mentally capable adult relative and physically capable adult relative, as defined by this Act; or

(b) any minor under 18 years of age or a minor 18 years of age or older for whom the court has made a finding of probable cause to believe that the minor is abused, neglected, or dependent under subsection (1) of Section 2-10 prior to the minor's 18th birthday whose environment is injurious to his or her welfare; or

***

(d) any minor under the age of 14 years whose parent or other person responsible for the minor's welfare leaves the minor without supervision for an unreasonable period of time without regard for the mental or physical health, safety, or welfare of that minor[.]" 705 ILCS 405/2-3(1) (West 2022).

17

¶ 38    The facts presented to the court do not support any of the bases for a finding of neglect under the Juvenile Court Act. The trial court's analysis in this case was on point and bears repeating: "It is a rotten thing to seek a financial gain in return for consent to adoption, but the evidence presented at trial suggests that at no time did Mr. Williams think he was putting his son in danger or harm's way."

¶ 39    Misconduct under the subsection 1(D)(h) is defined neither by statute nor by case law, so we must resort to the fundamentals of statutory interpretation. "When construing a statute, this court's fundamental objective is to ascertain and give effect to the intent of the legislature. The most reliable indicator of legislative intent is the statutory language itself, giving it its plain and ordinary meaning." *People ex rel. Madigan v. Wildermuth*, 2017 IL 120763, ¶ 17. The statute concerns "misconduct *toward the child.*" 750 ILCS 50/1(D)(h) (emphasis added). Giving these words their plain meaning, it must at minimum require action directed at the child or that negatively affects the child. At no point in petitioners' argument regarding this basis for unfitness do petitioners refer to any behavior on respondent's part toward E.W. except attempting to sell him. As we have discussed above, this description misrepresents the facts. Respondent's request for money in return for consent to adoption was not directed toward E.W. in any way. Had the offer been enforced, despite being unenforceable, there would have been an effect on E.W., but no evidence has been presented that the effect would have been negative. The result would have been adoption of E.W. by Kevin and his continued residence with petitioners. Inviting such a result does not constitute misconduct toward E.W.

¶ 40    Petitioners allege that the offer was an attempt to sell E.W. to a stranger, but that claim is not reflected in the record before us. Petitioners make no other suggestion that E.W. was ever neglected or negatively affected in any way and so there is no basis on which to find neglect

or abuse under subsection 1(D)(h). Accordingly, it was not against the manifest weight of the evidence for the trial court to deny a finding of unfitness based on misconduct or neglect. We affirm the trial court's decision in this regard.

¶ 41                                III. CONCLUSION

¶ 42        For the foregoing reasons, we affirm the decision of the trial court.

¶ 43        Affirmed.